[No. B215861. Second Dist., Div. Seven. Jan. 27, 2010.]

ANDREW ARCE, a Minor, etc., et al., Plaintiffs and Appellants, v. KAISER FOUNDATION HEALTH PLAN, INC., et al., Defendants and Respondents.

474

476

## Counsel

Law Offices of Scott C. Glovsky and Scott C. Glovsky for Plaintiffs and Appellants.

Chavez & Gertler, Mark A. Chavez, Nance F. Becker; Sid Wolinsky, Anna Levine and Katrina Kasey Corbit for Disability Rights Advocates as Amicus Curiae on behalf of Plaintiffs and Appellants.

Epstein Becker & Green, William A. Helvestine, Andrew J. Hefty, Lisa Caccavo and Damian D. Capozzola for Defendants and Respondents.

## Opinion

**ZELON, J.**—The California Mental Health Parity Act (Health & Saf. Code,[1] § 1374.72) mandates that every health care service plan provide coverage for the diagnosis and medically necessary treatment of severe mental illnesses, including autism, under the same terms and conditions applied to other

[1] Unless otherwise stated, all further statutory references are to the Health and Safety Code.

medical conditions. Appellant Andrew Arce (Arce), by and through his guardian ad litem Guillermo Arce, brought a class action suit under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) against respondents Kaiser Foundation Health Plan, Inc., The Permanente Medical Group, Inc., and Southern California Permanente Medical Group, Inc. (collectively Kaiser). In his second amended complaint, Arce alleges that Kaiser breached its health plan contract and violated the Mental Health Parity Act by categorically denying coverage for behavioral therapy and speech therapy to plan members with autism spectrum disorders.

 The trial court sustained Kaiser's demurrer to the UCL claim without leave to amend based on the doctrine of judicial abstention and the lack of commonality among class members. We conclude that the trial court erred in sustaining the demurrer because there is a reasonable possibility that Arce can establish the requisite community of interest for a class action suit under the UCL, and resolution of the UCL claim would not require the court to make individualized determinations of medical necessity or to decide complex issues of economic policy or other matters over which an administrative agency has exclusive jurisdiction. We accordingly reverse.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. *Kaiser's Denial of Coverage for Behavioral and Speech Therapy to Arce*

Arce is a four-year-old boy with autism. According to a 2007 report of the California Legislative Blue Ribbon Commission on Autism,[2] "[a]utism spectrum disorders are complex neurological disorders of development that onset in early childhood." (Cal. Legis. Blue Ribbon Com. on Autism, An Opportunity to Achieve Real Change for Californians with Autism Spectrum Disorders (Sept. 2007) p. 7.) These disorders, which include full spectrum autism, "affect the functioning of the brain to cause mild to severe difficulties, including language delays, communication problems, limited social skills, and repetitive and other unusual behaviors." (*Id.* at p. 8.) Nationally, autism spectrum disorders affect an estimated one in every 150 children across all racial, ethnic, and socioeconomic backgrounds. (*Ibid.*)

Arce is, and has been, a member of a health care service plan provided by Kaiser. According to Kaiser's 2008 evidence of coverage for the Kaiser

---

[2] In 2005, the California Legislature, by a concurrent resolution, established the Legislative Blue Ribbon Commission on Autism to study and investigate issues relating to the early identification and intervention of autism spectrum disorders, and to identify gaps in programs and services in the education and treatment of persons with autism spectrum disorders. (Sen. Conc. Res. No. 51, Stats. 2005 (2005–2006 Reg. Sess.) res. ch. 124.)

Permanente traditional plan, Kaiser provides coverage for the "Services" described and defines the term "Services" as "Health care services or items." Among other exclusions, Kaiser's evidence of coverage contains an exclusion from coverage for "Custodial care," which is defined as "assistance with activities of daily living (for example: walking, getting in and out of bed, bathing, dressing, feeding, toileting, and taking medicine), or care that can be performed safely and effectively by people, who in order to provide the care, do not require medical licenses or certificates or the presence of a supervising licensed nurse."

Before the age of two, Arce displayed certain symptoms associated with autism, including a lack of speech and lack of affection. In October 2007, Arce's pediatrician referred him to speech and occupational therapists for an assessment as to whether autism was the cause of his symptoms. Over the objections of Arce's father, Kaiser repeatedly cancelled and rescheduled the assessment appointment. In February 2008, after a delay of approximately four and one-half months, Kaiser's interdisciplinary team diagnosed Arce with autism and recommended two hours of occupational therapy per month to address his difficulty with swallowing food. Kaiser denied coverage for any other therapies to treat Arce's autism, including behavioral therapy and speech therapy requested by Arce's father. Kaiser informed Arce's father that it was denying coverage for these other therapies because they "were behavioral in nature, not medical, and could be provided by the Regional Center."[3]

In a March 14, 2008 letter to Arce's father, Kaiser addressed its denial of coverage for a behavioral therapy known as applied behavior analysis. Kaiser stated that, following a review by its regional appeals committee, it was denying coverage for the requested therapy because "Applied Behavior Analysis has been identified as an educational intervention that can be performed by a non-licensed person." Kaiser explained that the "[p]hysician's review has identified Applied Behavioral Analysis as one form of intervention that can be used to improve the behavior of a patient who has been diagnosed with autism. However, because ABA can be performed by a non-licensed individual, health plan coverage of ABA is an exclusion of [Arce's] health plan benefits." Kaiser specifically referred to the "Custodial care" exclusion set forth in its 2008 evidence of coverage.

---

[3] Pursuant to the Lanterman Developmental Disabilities Services Act (Welf. & Inst. Code, § 4500 et seq.), the State Department of Developmental Services contracts with private nonprofit corporations to establish and operate regional centers. (Welf. & Inst. Code, § 4621.) These regional centers are "responsible for determining eligibility, assessing needs and coordinating and delivering direct services to individuals with developmental disabilities and their families within a defined geographical area. [Citation.]" (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 682–683 [66 Cal.Rptr.3d 300].)

Arce's father filed an administrative grievance with the Department of Managed Health Care (DMHC) and requested an independent medical review of Kaiser's denial of coverage. The physician reviewer responsible for conducting the independent medical review overturned Kaiser's decision to deny coverage for the requested therapies. The reviewer determined that Kaiser was required to provide coverage for applied behavior analysis therapy at 20 hours per week, occupational therapy at 10 hours per week, and speech therapy twice per week to treat Arce's autism. On April 21, 2008, the DMHC adopted the independent medical review findings.

## II. *Arce's Civil Action Against Kaiser*

Acting through his father as his guardian ad litem, Arce filed a civil action against Kaiser in Los Angeles County Superior Court. In the operative second amended complaint, Arce alleged a cause of action for violation of the UCL on behalf of himself and a proposed class.[4] The proposed class consisted of all California residents who were Kaiser policyholders or health plan members and were "wrongfully" denied coverage for applied behavior analysis therapy or speech therapy for an autism spectrum disorder on the grounds that the therapies are "non-health care services," "academic or educational interventions," or "custodial care." Arce alleged that Kaiser has a pattern and practice of refusing to provide coverage for applied behavior analysis therapy and speech therapy for autism spectrum disorders on these grounds, and that Kaiser's denial of coverage constitutes an unlawful, unfair and fraudulent business practice in violation of the UCL. Among other allegations, Arce asserted that Kaiser's conduct is unlawful under the Mental Health Parity Act because Kaiser has "refus[ed] to provide coverage for diagnosis and treatment of autism under the same terms and conditions applied to other medical conditions." Arce requested injunctive and declaratory relief on behalf of the alleged class.

Kaiser demurred to the UCL cause of action, arguing that resolution of the UCL claim would require the trial court to make individualized determinations of medical necessity, which would defeat the commonality requirement for class claims under Code of Civil Procedure section 382. Kaiser also asserted that the trial court should equitably abstain from deciding which forms of therapy are properly subject to exclusion under Kaiser's health care plan and should instead leave such issues of economic policy to the

---

[4] The second amended complaint also included individual claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the false advertising law (Bus. & Prof. Code, § 17500). The trial court overruled Kaiser's demurrers to the causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing, and decided that the demurrer to the cause of action for violation of the false advertising law was moot. None of these individual claims are at issue in this appeal.

Legislature or the DMHC to decide. On January 29, 2009, the trial court sustained Kaiser's demurrer to the UCL claim without leave to amend. In its written order, the trial court set forth its conclusions: "The Court finds that the doctrine of abstention precludes the UCL cause of action. In addition to the reasons stated on the record during oral arguments, the Court sustains the demurrer to the UCL claim for the following reasons: [¶] The relief that the Plaintiffs seek is an injunction which would require the Court to take over the function of determining what treatments are 'medically necessary.' The Court declines to do this. [¶] Plaintiffs argue that they are not seeking such relief. However, if that is not the relief sought, then the only injunction that Plaintiffs seek is to force Kaiser to honor the contract. Thus, a breach of contract action stands. [¶] Plaintiffs have made no showing that the contract violates Health & Safety Code § 1374.72. The Code provides that treatment shall be provided if 'medically necessary.' Again, this Court cannot determine what is 'medically necessary.' [¶] Further, the determination of what is or is not 'medically necessary' would require an individual analysis of each putative class member's claim and thus the common questions do not predominate to warrant class action treatment of this issue."

Following the trial court's ruling on the demurrer, Arce filed a motion for reconsideration. In support of his motion, Arce submitted four letters from Kaiser to health plan members in 2007 and 2008 in which Kaiser allegedly denied coverage for applied behavior analysis therapy and speech therapy for an autism spectrum disorder on the grounds that such therapies are "non-health services," "academic" or "educational" interventions, or "custodial care." Arce argued that the denial letters demonstrated that Kaiser categorically denied coverage for these therapies irrespective of any individual issues of medical necessity that might be involved for a particular plan member. On April 1, 2009, the trial court denied the motion for reconsideration. The court stated on the record that "[t]here is nothing new for reconsideration. There is nothing here that would change my mind so there we are." On April 23, 2009, Arce filed a timely notice of appeal.

## DISCUSSION

### I. *Standard of Review*

In reviewing the sufficiency of a complaint against a demurrer, we "treat[] the demurrer as admitting all material facts properly pleaded," but we do not "assume the truth of contentions, deductions or conclusions of law." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) We liberally construe the pleading to achieve substantial justice between the parties, giving the complaint a reasonable interpretation and reading the allegations in context. (Code Civ. Proc., § 452; *Schifando v. City of*

*Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) When a demurrer is sustained, we must determine de novo whether the complaint alleges facts sufficient to state a cause of action under any legal theory. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189].) When a demurrer is sustained without leave to amend, we must also decide whether there is a reasonable possibility that the defect can be cured by amendment. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) If the complaint can be cured, the trial court has abused its discretion in sustaining without leave to amend. (*Ibid.*)

In cases where the trial court dismisses a cause of action based on the doctrine of judicial abstention, the standard of review is abuse of discretion. (*Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292, 1297 [64 Cal.Rptr.3d 250] (*Alvarado*); see also *Desert Healthcare Dist. v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781, 795 [114 Cal.Rptr.2d 623] (*Desert Healthcare*) ["because the remedies available under the UCL, namely injunctions and restitution, are equitable in nature, courts have the discretion to abstain from employing them"].) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. [Citations.]" (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339].)

## II. *Requests for Judicial Notice*

█ Because a demurrer challenges defects on the face of the complaint, it can only refer to matters outside the pleading that are subject to judicial notice. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318; *County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1008–1009 [78 Cal.Rptr.2d 272].) We must take judicial notice of matters properly noticed by the trial court, and may take notice of any matter specified in Evidence Code section 452. (Evid. Code, § 459, subd. (a).) While we may take judicial notice of court records and official acts of state agencies (Evid. Code, § 452, subds. (c), (d)), the truth of matters asserted in such documents is not subject to judicial notice (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564–1565 [8 Cal.Rptr.2d 552]). We also may decline to take judicial notice of matters that are not relevant to dispositive issues on appeal. (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 544, fn. 4 [67 Cal.Rptr.3d 330, 169 P.3d 559]; *Schifando v. City of Los Angeles, supra,* 31 Cal.4th at p. 1089, fn. 4.) Here, the parties and amicus

curiae have requested that this court take judicial notice of numerous court records and other documents.[5]

Arce and Kaiser have requested judicial notice of the pleadings and related court records in another case pending before the Los Angeles County Superior Court, *Consumer Watchdog v. Department of Managed Health Care* (No. BS121397) (*Consumer Watchdog* action). In the *Consumer Watchdog* action, a nonprofit consumer organization sued the DMHC, in part, for allegedly permitting health care service plans to deny coverage for applied behavior analysis therapy in violation of the Mental Health Parity Act. The documents at issue consist of (1) Consumer Watchdog's verified petition for writ of mandate and complaint, (2) the DMHC's demurrer to the complaint, (3) Consumer Watchdog's opposition to the demurrer, and (4) Consumer Watchdog's request for judicial notice in support of its opposition to the demurrer.[6] Pursuant to Evidence Code section 452, subdivision (d), we take judicial notice of these documents as "[r]ecords of . . . any court of this state." (Evid. Code, § 452, subd. (d)(1).) However, we do not take judicial notice of the truth of any factual assertions appearing in the documents. (*Sosinsky v. Grant, supra,* 6 Cal.App.4th at pp. 1564–1565; see also *Espinoza v. Calva* (2008) 169 Cal.App.4th 1393, 1396 [87 Cal.Rptr.3d 492] ["We can take judicial notice of the fact the pleadings were filed, but not of the truth of the statements contained in them."].)

In its amicus curiae brief, Disability Rights Advocates requests that we take judicial notice of the complaint filed in a case pending before the Alameda County Superior Court, *Anderson v. Kaiser Foundation Health*

---

[5] In addition to several requests for judicial notice, the parties have provided a rather voluminous record for an appeal from an order sustaining a demurrer. The parties and amicus curiae also cite to various journal articles and other publications about autism spectrum disorders, which were not part of the record before the trial court and are not subjects of requests for judicial notice to this court. Because this is an appeal from a ruling on a demurrer, our review must be based on the properly pleaded factual allegations in the complaint and the facts that may be properly judicially noticed. It is through this limited lens that we consider the sufficiency of Arce's complaint against Kaiser's demurrer.

[6] This court previously granted Arce's request for judicial notice of the trial court's order in the *Consumer Watchdog* action overruling the DMHC's demurrer to the complaint. (Evid. Code, § 452, subd. (d)(1).) We also granted Arce's request for judicial notice of select portions of the legislative history of two bills related to the Mental Health Parity Act—Assembly Bill No. 88 (1999–2000 Reg. Sess.) and Senate Bill No. 468 (1999–2000 Reg. Sess.). (Evid. Code, § 452, subd. (c).) Assembly Bill No. 88 was approved by the Legislature in 1999 and enacted into law as section 1374.72. (Assem. Bill No. 88 (1999–2000 Reg. Sess.) § 2.) Senate Bill No. 468 was a competing bill considered by the Legislature, but not approved. (Sen. Bill No. 468 (1999–2000 Reg. Sess.) § 1.)

*Plan, Inc.* (No. RG09435560) (*Anderson* action).[7] Disability Rights Advocates is cocounsel for the plaintiffs in the *Anderson* action, which alleges that Kaiser violated the Unruh Civil Rights Act (Civ. Code, § 51) and the Mental Health Parity Act by failing to provide coverage for the medically necessary treatment of autism under the same terms that it applies to other medical conditions. As with the court records in the *Consumer Watchdog* action, we take judicial notice of the complaint in the *Anderson* action, but not the truth of any allegations contained therein. (Evid. Code, § 452, subd. (d)(1); *Sosinsky v. Grant, supra,* 6 Cal.App.4th at pp. 1564–1565.) In support of its answer to the amicus curiae brief, Kaiser asks that we take judicial notice of an administrative decision of the DMHC partially overturning Kaiser's denial of coverage for one of the named plaintiffs in the *Anderson* action. Pursuant to Evidence Code section 452, subdivision (c), we take judicial notice of the DMHC's written decision as "[o]fficial acts of the legislative, executive, and judicial departments . . . of any state." (Evid. Code, § 452, subd. (c).) We do not, however, take judicial notice of the truth of any factual findings made in the DMHC's decision or in the attached independent medical review determination. (*Sosinsky v. Grant, supra,* at pp. 1564–1565; see also *Fowler v. Howell* (1996) 42 Cal.App.4th 1746, 1749 [50 Cal.Rptr.2d 484] ["a court may not take judicial notice of the *truth* of a factual finding made in another action"].)

In ruling on Kaiser's demurrer to the second amended complaint, the trial court also took judicial notice of numerous documents, as requested by the parties. On appeal, Arce argues that the trial court erred in overruling his objections to Kaiser's request for judicial notice of the 2007 report of the California Legislative Blue Ribbon Commission on Autism. Arce asserts that the report was prepared by a commission, not a legislative committee, and was not prepared in connection with a particular bill. However, " 'reports of legislative committees and commissions are part of a statute's legislative history,' " and may properly be subject to judicial notice as official acts of the Legislature (see Evid. Code, § 452, subd. (c)). (*Benson v. Workers' Comp. Appeals Bd.* (2009) 170 Cal.App.4th 1535, 1554, fn. 16 [89 Cal.Rptr.3d 166]; see also *Park v. Deftones* (1999) 71 Cal.App.4th 1465, 1472 [84 Cal.Rptr.2d 616] [judicial notice taken of report of commission established by the Legislature and relied upon by the Legislature in enacting statute].) The commission that prepared the report at issue here was established by the Legislature pursuant to a concurrent resolution (Sen. Conc. Res. No. 51, Stats. 2005 (2005–2006 Reg. Sess.) res. ch. 124), and the recommendations of the commission were expressly referenced by the Legislature in approving

---

[7] We note that amicus curiae did not file a separate motion requesting judicial notice, as required by California Rules of Court, rule 8.252(a)(1). However, in the absence of any objection by the parties, we consider this request.

Senate Bill No. 1563 (2007–2008 Reg. Sess.).[8] The trial court did not err in taking judicial notice of the commission report.

 Arce also contends that the trial court improperly refused to take judicial notice of a transcript and videotaped recording of an interview of Kaiser's associate executive director with an ABC news affiliate. Arce claims that these materials were proper matters for judicial notice as party admissions that contradicted Kaiser's arguments in its demurrer to the second amended complaint. It is true that a court may take judicial notice of a party's admissions or concessions, but only in cases where the admission "can not reasonably be controverted," such as in answers to interrogatories or requests for admission, or in affidavits and declarations filed on the party's behalf. (*Pang v. Beverly Hospital, Inc.* (2000) 79 Cal.App.4th 986, 989–990 [94 Cal.Rptr.2d 643]; see also *Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604–605 [176 Cal.Rptr. 824] ["The court will take judicial notice of records such as admissions, answers to interrogatories, affidavits, and the like, when considering a demurrer, only where they contain statements of the plaintiff or his agent which are inconsistent with the allegations of the pleading before the court."].) On the other hand, a party's statements in a television news interview do not constitute judicially noticeable facts, and thus, the trial court properly declined to take judicial notice of these materials.

III. *Demurrer to the Second Amended Complaint*

 On appeal, Arce challenges the trial court's order sustaining Kaiser's demurrer to the cause of action for violation of the UCL.[9] The UCL prohibits

---

[8] Senate Bill No. 1563 (2007–2008 Reg. Sess.), which was vetoed by the Governor, required the DMHC and the Department of Insurance to establish the Autism Workgroup for Equitable Health Insurance Coverage for purposes of examining issues related to health insurance coverage for autism. (Sen. Bill No. 1563 (2007–2008 Reg. Sess.) § 2.) In ruling on Kaiser's demurrer, the trial court took judicial notice of the bill and veto without any objection from Arce.

[9] In the second amended complaint, Arce pleaded his cause of action for violation of the UCL both "individually and on behalf of other similarly situated people." Under the so-called "death knell" doctrine, an order sustaining a demurrer to class action allegations which has the effect of dismissing a class action suit is immediately appealable, even where the order preserves to the plaintiff any individual claims he or she might have. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 698–699 [63 Cal.Rptr. 724, 433 P.2d 732]; *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 359–360 [19 Cal.Rptr.3d 29].) Subject to this exception for class action claims, an order sustaining a demurrer without leave to amend is ordinarily not appealable since the order is not a final judgment. (*Daar v. Yellow Cab Co., supra,* at pp. 698–699; *Alch v. Superior Court, supra,* at pp. 359–360.) It is unclear from the record before us whether Kaiser intended to demur to Arce's individual claim for violation of the UCL, and if so, whether the trial court intended to dismiss both the individual and class claims in its order sustaining Kaiser's demurrer to the UCL cause of action. It also is unclear whether Arce is seeking

"unfair competition," which is defined by the Business and Professions Code to include "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) By its terms, the statute is broad in scope. "It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' [Citations.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) "By defining unfair competition to include any *'unlawful . . .* business act or practice' [citation], the UCL permits violations of other laws to be treated as unfair competition that is independently actionable. [Citation.]" (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949 [119 Cal.Rptr.2d 296, 45 P.3d 243].) In addition, under the UCL, " 'a practice may be deemed unfair even if not specifically proscribed by some other law.' [Citation.]" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143 [131 Cal.Rptr.2d 29, 63 P.3d 937].) The remedies available under the UCL are "cumulative . . . to the remedies or penalties available under all other laws of this state." (Bus. & Prof. Code, § 17205.)

The trial court sustained the demurrer to the UCL claim on two separate grounds. First, the trial court concluded that Arce could not establish the requisite community of interest for a class action suit under Code of Civil Procedure section 382. Second, the trial court declined to adjudicate the claim under the doctrine of judicial abstention. We consider each basis for the trial court's decision.

## A. *Community of Interest Among Class Members*

■ Section 382 of the Code of Civil Procedure authorizes class action suits "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." (Code Civ. Proc., § 382.) The party seeking certification of a class must establish the existence of both an ascertainable class and a well-defined community of interest among the class members. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [17 Cal.Rptr.3d 906, 96 P.3d 194].) "The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. [Citation.]"

appellate review of his individual UCL claim, in addition to his class claim. To the extent that Arce is challenging an order sustaining a demurrer to an individual claim, this court does not have jurisdiction to entertain such an appeal. Our review of the trial court's ruling is therefore limited to the dismissal of the class action allegations in the third cause of action for violation of the UCL. To the extent that our opinion addresses legal issues that may be equally applicable to Arce's individual claim for violation of the UCL, we anticipate that the trial court will apply the same analysis to the individual claim on remand.

(*Ibid.*) " '[T]his means "each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants." ' [Citation.]" (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1108 [131 Cal.Rptr.2d 1, 63 P.3d 913].) "Other relevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing. [Citation.]" (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27].)

It is often premature for a trial court to make determinations pertaining to class suitability on demurrer. Rather, "all that is normally required for a complaint to survive demurrers to the propriety of class litigation is that the complaint allege facts that tend to show: (1) an ascertainable class of plaintiffs, and (2) questions of law and fact which are common to the class." (*Beckstead v. Superior Court* (1971) 21 Cal.App.3d 780, 784 [98 Cal.Rptr. 779].) As our Supreme Court has recognized, for purposes of determining whether a demurrer should have been overruled, "it is sufficient that there is a reasonable possibility plaintiffs can establish a prima facie community of interest among the class members . . . ." (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 813 [94 Cal.Rptr. 796, 484 P.2d 964]; see also *Beckstead v. Superior Court, supra,* at p. 783 ["[T]he California Supreme Court has mandated that a candidate complaint for class action consideration, if at all possible, be allowed to survive the pleading stages of litigation."].) Accordingly, "[w]here there is a 'reasonable possibility' that the plaintiff in a class action can establish a community of interest among class members, 'the preferred course is to defer decision on the propriety of the class action until an evidentiary hearing has been held on the appropriateness of class litigation.' [Citation.]" (*Canon U.S.A. v. Superior Court* (1998) 68 Cal.App.4th 1, 5 [79 Cal.Rptr.2d 897]; see also *Prince v. CLS Transportation, Inc.* (2004) 118 Cal.App.4th 1320, 1329 [13 Cal.Rptr.3d 725] [demurrer to class action complaint improper where the plaintiff "alleges institutional practices . . . that affected all of the members of the potential class in the same manner, and it appears from the complaint that all liability issues can be determined on a class-wide basis"].)

"The wisdom of allowing survival is elementary. Class action litigation is proper whenever it may be determined that it is more beneficial to the litigants and to the judicial process to try a suit in one action rather than in several actions . . . . It is clear that the more intimate the judge becomes with the character of the action, the more intelligently he [or she] may make the determination. If the judicial machinery encourages the decision to be made

at the pleading stages and the judge decides against class litigation, he [or she] divests the court of the power to later alter that decision. . . . Therefore, because the sustaining of demurrers without leave to amend represents the earliest possible determination of the propriety of class action litigation, it should be looked upon with disfavor." (*Beckstead v. Superior Court, supra,* 21 Cal.App.3d at p. 783.)

In sustaining Kaiser's demurrer to the UCL claim, the trial court concluded that Arce could not establish a predominance of common issues because resolution of the claim would require the court to make individualized determinations as to whether the therapies at issue were "medically necessary" for each member of the putative class. However, based on the allegations in the second amended complaint, the UCL claim presents two central legal issues that are common to all putative class members. First, does Kaiser's health plan contract exclude from coverage applied behavior analysis therapy or speech therapy for autism spectrum disorders on the grounds that such therapies are "non-health care services," "academic or educational interventions," or "custodial care"? Second, assuming that the therapies are excluded from coverage by the health plan contract, does the Mental Health Parity Act allow Kaiser to categorically apply such exclusions on the basis that the therapies are not health care services, or are provided by persons not licensed or certified by the state? While these issues clearly raise questions of contractual and statutory interpretation, neither would require the court to make individualized determinations of medical necessity for class members.

### 1. Breach of the Health Plan Contract

The first issue is one of contractual interpretation. In his second amended complaint, Arce alleges that Kaiser's health plan contract covers applied behavior analysis therapy and speech therapy to treat autism spectrum disorders, and that Kaiser has breached its contract by systematically denying coverage for these therapies to the putative class members. Resolution of this contractual issue would require the trial court to decide whether the therapies are "health care services," as that term is used in Kaiser's evidence of coverage, and if so, whether the therapies are subject to the contract's exclusion for "custodial care." It would not, however, require the trial court to evaluate whether the therapies are "medically necessary" for each member of the putative class. This is because the complaint does not allege that Kaiser's denial of coverage to the putative class was based on case-by-case determinations that the therapies were not medically necessary for the individual plan members. Instead, the complaint alleges that Kaiser's denial of coverage was based on an across-the-board determination that these categories of therapies are contractually excluded from coverage because they either are not "health care services" or are "custodial care," within the meaning of Kaiser's

evidence of coverage. Therefore, the common question of law posed by Arce's breach of contract allegations is whether the therapies at issue are covered services under the health plan contract; it is not whether the therapies, if covered services, are medically necessary for a particular plan member.

Kaiser argues that the trial court would not be able to adjudicate coverage issues without considering the individual medical needs of the class members. As an example, Kaiser points to a "speech therapy" exclusion in its evidence of coverage, which excludes coverage for speech therapy services "to treat social, behavioral, or cognitive delays in speech or language development unless Medically Necessary." According to Kaiser, the exclusion itself implicates issues of medical necessity because speech therapy would not be a covered service unless there was a showing that it was medically necessary for the individual plan member. However, in the second amended complaint, Arce does not allege that Kaiser improperly invoked this exclusion in denying coverage for speech therapy to the putative class. Instead, Arce alleges that the putative class members were denied coverage for speech therapy on other distinct grounds.

Kaiser asserts that the application of the "custodial care" exclusion also would mandate consideration of each class member's medical needs. Unlike the "speech therapy" exclusion, Kaiser's exclusion for "custodial care" is among the disputed contract provisions at issue in this case. However, as used in Kaiser's evidence of coverage, the term "custodial care" is not defined by the medical necessity of the treatment in question, but rather is based on whether the treatment "can be performed safely and effectively by people who . . . do not require medical licenses or certificates or the presence of a supervising licensed nurse." Indeed, in its letter denying coverage to Arce, Kaiser stated that applied behavior analysis therapy was subject to the "custodial care" exclusion because it "can be performed by a non-licensed individual." Contrary to Kaiser's claim, there is nothing in the plain language of the "custodial care" provision that would suggest that its application depends on the particular medical needs of the plan member.

■ If the trial court were to find that applied behavior analysis therapy and speech therapy for autism spectrum disorders are covered services under the terms of the health care plan, then Kaiser's alleged practice of categorically denying coverage for such services to the putative class could constitute a breach of contract. A breach of contract in turn may form the predicate for a UCL claim, " '*provided it also constitutes conduct that is "unlawful, or unfair, or fraudulent." ' *[Citations.]" (*Puentes v. Wells Fargo Home Mortgage, Inc.* (2008) 160 Cal.App.4th 638, 645 [72 Cal.Rptr.3d 903].) With respect to the unfairness prong of Business and Professions Code section 17200,

appellate courts have recognized that "a systematic breach of certain types of contracts (e.g., breaches of standard consumer or producer contracts involved in a class action) can constitute an unfair business practice under the UCL. [Citations.]" (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1483 [38 Cal.Rptr.3d 653]; see also *State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1104 [53 Cal.Rptr.2d 229], disapproved on other grounds in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at pp. 184–185; *Allied Grape Growers v. Bronco Wine Co.* (1988) 203 Cal.App.3d 432, 451–453 [249 Cal.Rptr. 872]; *Orkin Exterminating Co., Inc. v. F.T.C.* (11th Cir. 1988) 849 F.2d 1354, 1367–1368.) Consequently, Arce's allegations that Kaiser systematically breached its health plan contract by refusing to provide all putative class members with contractually covered services is sufficient to state a class action claim under the UCL.

Kaiser contends that Arce's breach of contract claim was pled solely as an individual claim, and not as a class action for violation of the UCL. Kaiser reasons that if Arce intended to pursue class relief for contractual issues, he should have pled such a theory in his second amended complaint. However, "the test of the adequacy of a complaint is whether it alleges sufficient *facts* to support a particular cause of action and not whether it expressly alleges legal theories of liability underlying a cause of action. A complaint is adequate if its factual allegations are sufficient to support a cause of action on any available legal theory (whether specifically pleaded or not). [Citation.]" (*Smith v. Wells Fargo Bank, N.A., supra,* 135 Cal.App.4th at p. 1485.) In pleading his class claim for violation of the UCL, Arce alleged that there were common questions as to whether Kaiser has "a pattern and practice of unlawfully, unfair[ly], or fraudulently refusing to cover" applied behavior analysis therapy and speech therapy for autism spectrum disorders "on the ground that there is no coverage for non-health care services[,] . . . academic or educational interventions[,] . . . [or] custodial care." Arce further alleged that there were common questions as to whether Kaiser's "contractual interpretations . . . constitute a breach of contract." Given the requirement that we liberally construe the complaint, Arce's allegations are sufficient to state a class action claim for violation of the UCL based on Kaiser's purported systematic breach of its health care plan.

### 2. *Violation of the Mental Health Parity Act*

Even assuming that applied behavior analysis therapy and speech therapy for autism spectrum disorders are not covered services under Kaiser's health plan contract, Arce still could state a class action claim for violation of the UCL if Kaiser's alleged practice of categorically denying coverage for the therapies is unlawful under the Mental Health Parity Act (§ 1374.72). Under

this theory of the case, the legal question common to the putative class is whether the Mental Health Parity Act permits Kaiser to exclude applied behavior analysis therapy and speech therapy from coverage on the grounds that the therapies are "non-health care services," "academic or educational interventions," or "custodial care." This second issue is thus one of statutory interpretation.

■ The Mental Health Parity Act, codified at section 1374.72, was enacted by the California Legislature in 1999. (Stats. 1999, ch. 534, § 2, p. 3702.) It states, in pertinent part, that "[e]very health care service plan contract . . . that provides hospital, medical, or surgical coverage shall provide coverage for the diagnosis and medically necessary treatment of severe mental illnesses of a person of any age . . . under the same terms and conditions applied to other medical conditions . . . ." (§ 1374.72, subd. (a).) In essence, section 1374.72 is a mental health insurance mandate which "obligate[s] health plans to provide coverage (not merely offer it) for the diagnosis and treatment of mental illness equal to coverage that the plans appl[y] to other medical conditions." (*Yeager v. Blue Cross of California* (2009) 175 Cal.App.4th 1098, 1103 [96 Cal.Rptr.3d 723], fn. omitted.) The benefits mandated by the statute include outpatient services, inpatient and partial hospital services, and pre-scription drugs if the health plan contract includes prescription drug coverage. (§ 1374.72, subd. (b).) The terms and conditions that shall be applied equally to all such benefits include, but are not limited to, maximum lifetime benefits, copayments, and deductibles. (§ 1374.72, subd. (c).) The statute specifically defines "severe mental illnesses" to include autism. (§ 1374.72, subd. (d)(7).)

In enacting the Mental Health Parity Act, the Legislature expressly found that "[m]ost private health insurance policies provide coverage for mental illness at levels far below coverage for other physical illnesses," and that "[l]imitations in coverage for mental illness in private insurance policies have resulted in inadequate treatment for persons with these illnesses." (Stats. 1999, ch. 534, § 1, p. 3702.) The Legislature further found that "[t]he failure to provide adequate coverage for mental illnesses in private health insurance policies has resulted in significant increased expenditures for state and local governments." (*Ibid.*) The stated purpose of the statute was to "prohibit discrimination against people with biologically-based mental illnesses, dispel artificial and scientifically unsound distinctions between mental and physical illnesses, and require equitable mental health coverage among all health plans and insurers to prevent adverse risk selection by health plans and insurers." (Assem. Com. on Health, Rep. on Assem. Bill No. 88 (1999–2000 Reg. Sess.) as amended Feb. 24, 1999, p. 2.)

■ The Mental Health Parity Act is a part of the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act) (§ 1340 et seq.). The

Knox-Keene Act sets forth a comprehensive system of licensing and regulation of the health care service plan industry. (*Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211, 215 [31 Cal.Rptr.3d 688] (*Bell*).) Among other mandates, a health care service plan governed by the Knox-Keene Act generally must provide plan members with "basic health care services." (§ 1367, subd. (i).) The plan also must furnish the services "in a manner providing continuity of care and ready referral of patients to other providers at times as may be appropriate consistent with good professional practice." (§ 1367, subd. (d).) The Knox-Keene Act requires the DMHC to execute laws relating to the health care service plan industry and to ensure that health care service plans provide enrollees with access to quality health care services. (§ 1341, subd. (a).)

■ In accordance with its authority, the DMHC has adopted an administrative regulation regarding the Mental Health Parity Act. (Cal. Code Regs., tit. 28, § 1300.74.72.) It provides that "[t]he mental health services required for the diagnosis, and treatment of conditions set forth in Health and Safety Code section 1374.72 shall include, when medically necessary, all health care services required under the [Knox-Keene] Act including, but not limited to, basic health care services within the meaning of Health and Safety Code sections 1345(b) and 1367(i), and section 1300.67 of Title 28." (Cal. Code Regs., tit. 28, § 1300.74.72, subd. (a).) Section 1345, subdivision (b) defines "basic health care services" as including physician services, hospital inpatient services, ambulatory care services, and home health services. (§ 1345, subd. (b).) "Ambulatory care services" are defined by the regulations as "outpatient hospital services," and include "diagnostic and treatment services, physical therapy, speech therapy, [and] occupational therapy services as appropriate." (Cal. Code Regs., tit. 28, § 1300.67, subd. (c).)

■ The Mental Health Parity Act regulation also states that a health care plan "shall provide coverage for the diagnosis and medically necessary treatment of conditions set forth in Health and Safety Code section 1374.72 through health care providers within the meaning of Health and Safety Code section 1345(i) who are: [¶] (1) acting within the scope of their licensure, and [¶] (2) acting within their scope of competence, established by education, training and experience . . . ." (Cal. Code Regs., tit. 28, § 1300.74.72, subd. (b).) Section 1345, subdivision (i) defines a "provider" as "any professional person, organization, health facility, or other person or institution licensed by the state to deliver or furnish health care services." (§ 1345, subd. (i).) With respect to ambulatory or outpatient care services, the regulations state that "[s]uch services may be provided at a hospital, any other appropriate licensed facility, or any appropriate facility which is not required by law to be licensed, if the professionals delivering such services are licensed to practice, are certified, or practice under the authority of the plan, a

medical group, or individual practice association or other authority authorized by applicable California law." (Cal. Code Regs., tit. 28, § 1300.67, subd. (c).)

In this case, Arce alleges that Kaiser has engaged in unlawful conduct under the UCL by denying coverage for the diagnosis and treatment of autism spectrum disorders under the same terms and conditions applied to other medical conditions in violation of the Mental Health Parity Act. In sustaining the demurrer to the UCL claim, the trial court noted that the Mental Health Parity Act only mandates coverage for health care services when such services are "medically necessary." The court reasoned that to determine whether there was an actual violation of the statute, it would need to evaluate whether the therapies at issue were medically necessary for each member of the putative class. In the trial court's view, because the determination of medical necessity would depend on the particular medical needs of each putative class member, Arce could not establish a predominance of common questions of law or fact. We conclude, however, that the trial court too narrowly read the nature of Arce's class allegations and the protections of the Mental Health Parity Act.

In sustaining the demurrer, it appears that the trial court assumed that Arce could only prove a violation of the Mental Health Parity Act if he could demonstrate that the therapies at issue were medically necessary for the putative class members and that Kaiser denied coverage based on a determination that they were not. While that is one means of establishing a violation of the statute, it is not the exclusive means. It is possible that Arce also could prove a statutory violation by showing that Kaiser categorically denies coverage for mental health care services that may, in some circumstances, be medically necessary, and that Kaiser does so without considering whether such services are in fact medically necessary for its individual plan members. In that case, the violation would not be that Kaiser wrongfully determines that the services are not medically necessary—the violation would be that Kaiser refuses to make that determination at all. That is the nature of the statutory violation alleged here.

In his second amended complaint, Arce alleges that Kaiser has a statutory obligation under the Mental Health Parity Act to provide coverage for the medically necessary treatment of autism, and that applied behavior analysis therapy and speech therapy are treatments for autism that can be medically necessary. Arce also alleges that Kaiser has a uniform practice of denying coverage for these therapies not on medical necessity grounds, but on the grounds that the therapies are "non-health care services," "academic or educational interventions," or "custodial care." Accordingly, the gravamen of Arce's complaint is that Kaiser categorically refuses to cover applied behavior analysis therapy and speech therapy for autism spectrum disorders

regardless of any individual issues of medical necessity that may be involved for a particular plan member. In other words, Kaiser never considers the issue of medical necessity because it has concluded that there is no coverage for these therapies in the first place. To adjudicate whether Kaiser has violated the Mental Health Parity Act by denying coverage for applied behavior analysis therapy and speech therapy on these grounds, the trial court would not need to engage in individualized determinations of medical necessity for each putative class member. Instead, resolution of this issue would require the trial court to decide whether the therapies are health care services under the Mental Health Parity Act, and if so, whether the statute mandates that services only be provided by health care professionals licensed or certified by the state.

As alleged in the second amended complaint, one of Kaiser's bases for denying coverage for applied behavior analysis therapy and speech therapy to treat autism spectrum disorders is that the therapies are not "health care services" because they are either "academic" or "educational" interventions. In its respondent's brief, Kaiser asserts that both the Mental Health Parity Act and the Knox-Keene Act only require that a health care plan provide coverage for "health care services," and it is Kaiser's position that the therapies at issue are not "health care services." As discussed above, the Knox-Keene Act defines "basic health care services" as including ambulatory or outpatient care (§ 1345, subd. (b)), and "ambulatory care services" are defined as including "diagnostic and treatment services, physical therapy, speech therapy, [and] occupational therapy services as appropriate" (Cal. Code Regs., tit. 28, § 1300.67, subd. (c)). Therefore, to determine whether Kaiser's classification of applied behavior analysis therapy and speech therapy as "non-health care services" violates the Mental Health Parity Act, the trial court would need to decide whether the therapies constitute "health care services" within the meaning of the statute. If the trial court were to conclude that the therapies are "health care services" under the Mental Health Parity Act and the Knox-Keene Act, then Arce arguably could prove a violation of the statute by showing that Kaiser categorically has refused to cover such services for the treatment of autism irrespective of their medical necessity for the individual plan members.

As alleged by Arce, Kaiser's other basis for denying coverage to the putative class members is that applied behavior analysis therapy and speech therapy are subject to the "custodial care" exclusion because they can be provided by nonlicensed persons. According to Kaiser, this exclusion is consistent with the Knox-Keene Act, which requires that providers be licensed by the state to deliver or furnish health care services. Thus, to determine whether Kaiser's classification of applied behavior analysis therapy and speech therapy as "custodial care" violates the Mental Health Parity Act, the trial court would need to decide whether the statute mandates that health care

services be provided by persons who are licensed or certified by the state. If neither the Mental Health Parity Act nor the Knox-Keene Act requires that the providers of health care services have a state-issued license or certification, then Arce may be able to demonstrate that Kaiser has violated the statute by imposing such a condition on health care services for the treatment of autism. Resolving this aspect of Arce's UCL claim would require the trial court to interpret the relevant provisions of the Mental Health Parity Act and the Knox-Keene Act, as well as any applicable administrative regulations. It would not, however, require the trial court to consider the particular medical needs and health histories of the putative class members.

Kaiser argues that the injunctive relief requested by Arce would immerse the trial court in individual medical considerations that are inappropriate for class treatment. According to Kaiser, what Arce is actually seeking through his class claim is a court order that applied behavior analysis therapy and speech therapy are always medically necessary services which must be covered for all autistic plan members. However, based on the allegations in the second amended complaint, Arce is not requesting an injunction requiring Kaiser to provide applied behavior analysis therapy or speech therapy to all plan members with an autism spectrum disorder, nor is he seeking a judicial declaration that these therapies are medically necessary for each member of the putative class. Instead, as alleged by Arce, the UCL claim is limited to the questions of whether Kaiser is in breach of its health plan contract or in violation of the Mental Health Parity Act by categorically denying coverage for the therapies. While these questions raise issues of contractual and statutory interpretation, their resolution does not depend on a finding that applied behavior analysis therapy and speech therapy are medically necessary for all class members.

Kaiser further contends that its denials of coverage for applied behavior analysis therapy and speech therapy are not based solely on the nature of the services, but also depend on the plan member's particular health history and medical needs. However, in reviewing the sufficiency of a complaint against a demurrer, we must assume the truth of all material facts properly pleaded, together with the facts that may be properly judicially noticed. (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814 [107 Cal.Rptr.2d 369, 23 P.3d 601]; *Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.) Here, the complaint alleges that when Kaiser denies coverage for applied behavior analysis therapy and speech therapy to treat autism spectrum disorders, it does so on the grounds that these categories of therapies are excluded from coverage as "non-health care services," "academic or educational interventions," or "custodial care." Kaiser's claim that its denials of coverage are actually based on individualized determinations of medical necessity is a factual issue that cannot be resolved on demurrer.

In sum, Arce's second amended complaint sufficiently alleges that Kaiser has a uniform policy of categorically denying coverage for health care services to treat autism spectrum disorders without determining whether the services are medically necessary for the individual plan members. We express no opinion about the truth of those allegations or the merits of Arce's UCL claim. Rather, we conclude that, for purposes of our review, there is a reasonable possibility that Arce can demonstrate a predominance of common issues to support a class action claim for violation of the UCL. The trial court accordingly erred in sustaining the demurrer to the UCL claim on the ground that Arce could not establish the requisite community of interest for a class action suit.[10]

## B. *Doctrine of Judicial Abstention*

The trial court sustained the demurrer to the UCL claim on the separate ground that the doctrine of judicial abstention precluded a cause of action for violation of the UCL. The court reasoned that the injunctive relief sought by Arce would require it "to take over the function of determining what treatments are 'medically necessary,' " which the court declined to do. We conclude, however, that the trial court abused its discretion in applying the doctrine of judicial abstention to the UCL claim.

As a general matter, a trial court may abstain from adjudicating a suit that seeks equitable remedies if "granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency." (*Alvarado, supra,* 153 Cal.App.4th at p. 1298.) A court also may abstain when "the lawsuit involves determining complex economic policy, which is best handled by the Legislature or an administrative agency." (*Ibid.*) In addition, judicial abstention may be appropriate in cases where "granting injunctive relief would be unnecessarily burdensome for the trial court to monitor and enforce given the availability of more effective means of redress." (*Ibid.*)

The courts have considered the authority of a trial court to adjudicate, or abstain from adjudicating, UCL claims that seek to enjoin alleged unlawful

---

[10] We note that, in his second amended complaint, Arce defined the proposed class as Kaiser policyholders or health plan members for whom applied behavior analysis therapy or speech therapy for an autism spectrum disorder "was wrongfully determined to be not covered" on the grounds that the therapies are non-health-care services, academic or educational interventions, or custodial care. As this court has explained, "a class is properly defined in terms of 'objective characteristics and common transactional facts,' not by identifying the ultimate facts that will establish liability. [Citation.]" (*Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1531 [87 Cal.Rptr.3d 518].) However, given that the ascertainability of the putative class was not a basis for Kaiser's demurrer or the trial court's order, we leave it to the parties and the trial court to address the proper definition of the proposed class in any later proceedings on class certification that may be held.

conduct in the health care service industry. In *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284 [22 Cal.Rptr.2d 20] (*Samura*), a plan member sued Kaiser for injunctive relief under the UCL on the basis that Kaiser's third party liability provisions in its service agreements were unlawful under the Knox-Keene Act. Relying on certain regulatory provisions in the Knox-Keene Act, the trial court issued an injunction requiring Kaiser to rewrite the service agreements to clarify its third party liability terms. (17 Cal.App.4th at p. 1291.) The Court of Appeal reversed on the ground that the trial court's order sought to enjoin acts that were not made unlawful by the Knox-Keene Act, but rather pertained to statutory provisions that were merely regulatory in nature. (17 Cal.App.4th at pp. 1300–1302.) The court explained that it was "immaterial whether or not the challenged contract provisions and business practices comply with these portions of the Knox-Keene Act because the statutes do not define unlawful acts that may be enjoined under Business and Professions Code section 17200." (*Id.* at p. 1301, fn. omitted.) Instead, the statutory provisions at issue related solely to the regulatory powers of the DMHC's predecessor, the Department of Corporations. (*Ibid.*) The court in *Samura* made clear that a private party "may still sue to enjoin acts which are made unlawful by the Knox-Keene Act." (*Id.* at p. 1299.) However, to the extent that the injunction was "based on portions of the Knox-Keene Act having a purely regulatory import, it improperly invade[d] the powers that the Legislature entrusted to the Department of Corporations." (*Id.* at p. 1302.)

In *Desert Healthcare, supra,* 94 Cal.App.4th 781, a hospital brought a UCL action against a health care service plan to recover for medical services provided to plan members through an intermediary that had declared bankruptcy. The hospital alleged that the plan violated the UCL by requiring waivers from its providers and by transferring its risk to intermediaries through capitation agreements. (94 Cal.App.4th at p. 793.) The Court of Appeal concluded that the hospital could not state an actionable UCL claim because the Knox-Keene Act expressly permitted the types of capitation agreements that the hospital alleged were unlawful, unfair, or fraudulent under the UCL. (94 Cal.App.4th at p. 793.) The court also expressed in dicta that even if the hospital could amend the complaint to plead a valid cause of action, it did "not believe that judicial intervention under the guise of the UCL would be proper in this case." (*Id.* at p. 794.) The court noted that the gravamen of the UCL action was that the plan had "abused the capitation system by transferring too much risk to its intermediary without adequate oversight." (94 Cal.App.4th at pp. 795–796.) The court reasoned that to fashion an appropriate remedy for such a claim, "the trial court would have to determine the appropriate levels of capitation and oversight," and "[s]uch an inquiry would pull the court deep into the thicket of the health care finance industry, an economic arena that courts are ill-equipped to meddle in." (*Id.* at p. 796.)

In *Alvarado, supra*, 153 Cal.App.4th 1292, a private party filed a class action suit for violation of the UCL, seeking restitution and injunctive relief to require the owners and operators of skilled nursing and intermediate care facilities to comply with certain statutory requirements for nursing hours. The statutory provision at issue required the State Department of Health Care Services (DHCS) to adopt regulations setting forth the minimum number of nursing hours per patient required in skilled nursing and intermediate care facilities. (153 Cal.App.4th at p. 1303.) In holding that the trial court did not abuse its discretion in applying the equitable abstention doctrine, the Court of Appeal first noted that the action was based on "a regulatory statute, which the Legislature intended the DHCS to enforce." (*Id.* at p. 1304.) The court then explained that there were numerous variables for determining whether a particular facility was providing the requisite number of nursing hours and that calculating whether each facility operating in California was in compliance was a "task better accomplished by an administrative agency than by trial courts." (*Id.* at p. 1306.) The court also reasoned that "[i]f the trial court were to adjudicate this case, it would have to decide whether to issue networks of injunctions across the State of California . . . ," and then "would have to monitor and enforce them." (*Ibid.*) Because "granting the requested injunctive relief would place a tremendous burden on the trial court to undertake a classwide regulatory function and manage the long-term monitoring process to ensure compliance . . . ," judicial abstention was appropriate. (*Ibid.*)

■ Other decisions, however, have recognized that trial courts can properly exercise jurisdiction over UCL claims that seek equitable relief for violations of the Knox-Keene Act. In *Bell, supra*, 131 Cal.App.4th 211, for instance, emergency room physicians sued a health care service plan for injunctive relief under the UCL on the grounds that the plan violated section 1371.4, part of the Knox-Keene Act, by reimbursing noncontracting physicians at amounts below the cost and value of services. In holding that the physicians adequately pled a UCL cause of action, the Court of Appeal rejected the plan's argument that the DMHC had exclusive jurisdiction to enforce the provisions of the Knox-Keene Act. (*Bell*, at pp. 214–215.) Rather, as the court explained, section 1371.4 imposed a "mandatory duty upon health care plans to reimburse noncontracting providers for emergency medical services." (*Bell*, at p. 216.) "Although the Department of Managed Health Care has jurisdiction over the subject matter of section 1371.4 (as well as the rest of the Knox-Keene Act), its jurisdiction is not exclusive and there is nothing in section 1371.4 or in the Act generally to preclude a private action under the UCL . . . . [Citations.]" (*Id.* at pp. 216–217.) The court also noted that *Samura* was consistent with its holding because *Samura* did not purport to give the DMHC exclusive jurisdiction to enforce every section of statute, but "simply limits a . . . suit for injunctive relief to 'acts which are

made unlawful by the Knox-Keene Act.' [Citation.]" (*Id.* at p. 217; see also *Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 542, fn. 13 [72 Cal.Rptr.3d 888] [distinguishing *Samura* on similar grounds and "reject[ing] any suggestion that a private party cannot sue to enforce underlying laws when those laws provide for enforcement by a public officer"].)

In a recent decision, Division One of this district held that the doctrine of judicial abstention did not preclude a UCL action against a health care service plan alleging violations of the Knox-Keene Act. (*Blue Cross of California, Inc. v. Superior Court* (2009) 180 Cal.App.4th 138 [102 Cal.Rptr.3d 615] (*Blue Cross*). In *Blue Cross*, the Los Angeles City Attorney filed suit against Blue Cross under the UCL on the grounds that the plan's postclaims underwriting practices were unlawful under the Knox-Keene Act. (180 Cal.App.4th at pp. 142–143.) Blue Cross argued that the trial court should abstain from adjudicating the action because the case would require the court to assume regulatory powers over the health care industry, which was a task better accomplished by the DMHC. (*Id.* at p. 146.) The trial court declined to abstain and the Court of Appeal affirmed. (*Id.* at pp. 156–158.) In rejecting Blue Cross's abstention arguments, the court noted that the city attorney was not asking the trial court to assume or interfere with the functions of the DMHC, but rather "to perform an ordinary judicial function, namely, to grant relief under the UCL . . . for business practices that are made unlawful by statute." (*Id.* at p. 157.) The court further reasoned that the trial court would not be required to determine complex economic policy because the Legislature had "already made the relevant policy determinations" and the court was "merely being called upon to enforce those statutory prohibitions." (*Id.* at p. 158.) In addition, the city attorney was not seeking a form of equitable relief that "would be unnecessarily burdensome for the court to monitor or enforce." (*Ibid.*) Based on these factors, the UCL action was appropriate for adjudication by the trial court.

■ In this case, the trial court decided to abstain from adjudicating Arce's UCL claim because it believed that the requested relief would require it to determine "what treatments were 'medically necessary.' " However, as discussed above, resolution of the UCL claim would not call upon the court to engage in individualized determinations of medical necessity for each putative class member, but rather to perform the basic judicial functions of contractual and statutory interpretation. To determine whether Kaiser systematically breached its health plan contract by denying coverage for applied behavior analysis therapy and speech therapy for autism spectrum disorders, the trial court would need to interpret the relevant terms of the contract, and decide whether the therapies are or are not covered services. " 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citation.]" (*Palmer v.*

*Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568].) Furthermore, "[t]he interpretation of an insurance contract, as with that of any written instrument, is primarily a judicial function. [Citation.]" (*Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100 [37 Cal.Rptr.2d 508].)

Similarly, to determine whether Kaiser violated the Mental Health Parity Act by denying coverage for the therapies, the trial court would need to interpret the relevant provisions of the Mental Health Parity Act and the Knox-Keene Act, and decide whether the therapies are health care services under the statute and whether the statute requires that the services only be provided by state-licensed or -certified professionals. Issues of statutory interpretation clearly are questions of law for the courts. (*Reno v. Baird* (1998) 18 Cal.4th 640, 660 [76 Cal.Rptr.2d 499, 957 P.2d 1333] ["ultimately statutory interpretation is a question of law the courts must resolve"].) Moreover, in resolving UCL claims, courts routinely are called upon to decide whether an alleged business practice is made unlawful by an underlying statute. This includes adjudicating UCL claims that are predicated on alleged violations of the Knox-Keene Act. (See, e.g., *Blue Cross, supra,* 180 Cal.App.4th at pp. 156–158 [UCL claim based on alleged violation of § 1389.3]; *Bell, supra,* 131 Cal.App.4th at pp. 216–217 [UCL claim based on alleged violation of § 1371.4]; *Yeager v. Blue Cross of California, supra,* 175 Cal.App.4th at pp. 1100–1101 [UCL claim based on alleged violation of § 1374.55].)

 Although the trial court did not identify any other basis for abstaining apart from its concerns about medical necessity determinations, we conclude that none of the other traditional grounds for judicial abstention are applicable here. For instance, there is no indication that granting injunctive or declaratory relief in this action would be unnecessarily burdensome for the trial court. The relief sought by Arce in his UCL claim is limited to whether Kaiser has breached its health plan contract or violated the Mental Health Parity Act by categorically denying coverage for applied behavior analysis therapy and speech therapy. Arce is not seeking a declaratory judgment that applied behavior analysis therapy and speech therapy are medically necessary treatments for all putative class members. Nor is Arce asking the court to issue a network of injunctions across the state or to engage in a long-term monitoring process to ensure compliance with its order. As the Court of Appeal noted in *Blue Cross,* "[i]f the trial court issues an injunction, then defendants will be expected to comply with it, but that does not impose on the court any active role in monitoring compliance," such that abstention would be warranted. (*Blue Cross, supra,* 180 Cal.App.4th at p. 158.)

Adjudication of Arce's UCL claim also would not call upon the court to determine complex issues of economic or health policy. We note that the

parties and amicus curiae have provided rather detailed policy discussions about the social and economic benefits and costs associated with requiring health care service plans to provide coverage for the treatment of autism. Kaiser, in particular, argues that "whether and to what extent health insurance coverage is to be expanded to include new services not previously covered by health insurance involves complex health care and economic policy considerations" that are best left to the Legislature. However, the Legislature already has made the relevant policy determinations in mandating that health care plans provide coverage for the medically necessary treatment of autism under the same terms and conditions applied to other medical conditions. (§ 1374.72.) The legal question before the trial court is whether the therapies at issue are "health care services" within the meaning of the Mental Health Parity Act and the Knox-Keene Act, and if so, whether the statute requires that the services only be provided by persons licensed or certified by the state. These are issues of statutory interpretation that are well suited for adjudication by the courts.

 Arce's request for injunctive relief also would not require the trial court to assume or interfere with the functions of an administrative agency. As the courts in *Bell* and *Blue Cross* made clear, although the Knox-Keene Act expressly authorizes the DMHC to enforce the statute, its jurisdiction is not exclusive. (*Bell, supra,* 131 Cal.App.4th at pp. 216–217; *Blue Cross, supra,* 180 Cal.App.4th at pp. 150–151.) Private individuals are still entitled to bring suit under the UCL to enjoin acts made unlawful by the Knox-Keene Act. Here, Arce's UCL claim is predicated, in part, on an alleged violation of the Mental Health Parity Act. The Mental Health Parity Act, which is part of the Knox-Keene Act, is not a purely regulatory statute. Rather, it imposes mandatory obligations upon health care plans and makes it unlawful for a health care plan to deny coverage for the medically necessary treatment of autism. (§ 1374.72.) Because a denial of coverage for health care services to treat autism can constitute a violation of the Mental Health Parity Act, it may be enjoined as unlawful conduct under the UCL.

While acknowledging that the jurisdiction of the DMHC is not exclusive, Kaiser asserts that the agency has established well-defined parallel procedures to address issues of coverage and medical necessity for the members of health care service plans. It is true that, pursuant to the Knox-Keene Act, the DMHC provides an administrative process by which a health care plan member may challenge a denial of coverage. In the DMHC's grievance system, the DMHC determines whether a disputed service is a covered benefit under the health plan contract, and if so, it orders the plan to promptly offer and provide the service to the member. (§ 1368, subd. (b).) If the DMHC determines that a health care plan has denied coverage for a service on the ground that the service is not medically necessary, then the grievance is eligible for review under the agency's independent medical review system.

(§ 1374.30.) In the independent medical review system, medical professional reviewers determine whether a disputed service is medically necessary based on such factors as the specific medical needs of the plan member and the medical evidence on the effectiveness of the service. (§ 1374.33.) However, the Knox-Keene Act makes clear that the DMHC grievance system and the independent medical review system are neither required nor exclusive remedies. (See § 1368, subd. (d) [The DMHC's grievance system "shall be in addition to any other procedures that may be available to any person, and failure to pursue, exhaust, or engage in the procedures described in this section shall not preclude the use of any other remedy provided by law."]; § 1374.30, subd. (h) ["The independent medical review process authorized by this article is in addition to any other procedures or remedies that may be available."].) Thus, notwithstanding the availability of administrative remedies, a private party may still file suit under the UCL for violation of the Mental Health Parity Act.

 Kaiser contends that the DMHC is better suited to decide when and under what circumstances a health care plan should provide coverage for services to treat autism. In particular, Kaiser points to a March 2009 memorandum from the DMHC to health care service plans as evidence that "the regulatory process is working." In the memorandum, the DMHC stated that it is committed to ensuring that individuals with autism spectrum disorders receive the care to which they are entitled under the Knox-Keene Act. The DMHC also explained that it intends to "continue to enforce existing law regarding the grievance and [independent medical review] process," and to "initiate the rulemaking process to formalize plan requirements and provide additional clarity through an open and public process." Kaiser reasons that abstention will allow the DMHC the time to perform its regulatory functions and to develop further regulations to address the specific issues raised by this suit. However, the fact that an administrative agency may, at some future time, adopt new regulations bearing on pending legal issues does not mean that a court should abstain from adjudicating a presently justiciable controversy. The putative class members in this case are children with autism spectrum disorders who allegedly have been denied coverage for mental health care services in breach of the health plan contract and in violation of the Mental Health Parity Act. These individuals are entitled to a timely determination of their rights. Because adjudication of Arce's suit would not require the trial court to make individualized determinations of medical necessity, to evaluate complex issues of economic policy, or to decide matters within the exclusive jurisdiction of the DMHC, the trial court abused its discretion in concluding that the doctrine of judicial abstention precluded the UCL claim. The trial court therefore erred in sustaining Kaiser's demurrer to the cause of action for violation of the UCL.

## DISPOSITION

The trial court's order sustaining the demurrer to the class action allegations of the third cause of action for violation of the UCL is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion. Arce shall recover his costs on appeal.

Perluss, P. J., and Woods, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 28, 2010, S180816. Werdegar, J., did not participate therein.