Filed 9/10/13

*CERTIFIED FOR PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CONSUMER WATCHDOG et al., | B232338 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS121397) |
| v. | |
| DEPARTMENT OF MANAGED HEALTH CARE et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert H. O'Brien and James C. Chalfant, Judges. Judgment is affirmed in part and reversed in part and remanded with directions.

Consumer Watchdog, Harvey Rosenfield, Pamela M. Pressley and Jerry Flanagan; Strumwasser & Woocher, Fredric D. Woocher, Beverly Grossman and Byron F. Kahr for Plaintiffs and Appellants.

Law Office of Stephen P. Sommers, Stephen P. Sommers and Una Lee Jost as Amicus Curiae for California Association for Behavior Analysis on behalf of Consumer Watchdog.

Autism Speaks and Daniel R. Unumb; Kaye Scholer and Robert Barnes for Autism Speaks and Autism Deserves Equal Coverage as Amicus Curiae on behalf of Plaintiffs and Appellants.

California Department of Managed Health Care, Holly Pearson, General Counsel, Debra L. Denton, Assistant Chief Counsel and Drew A. Brereton, Senior Counsel; Attorney General of California, Kamala D. Harris, Attorney General, Julie Wend-Gutierrez, Senior Assistant Attorney General, Leslie P. McElroy, Supervising Deputy Attorney General and Carmen D. Snuggs, Deputy Attorney General.

Department of Insurance, Dave Jones, Insurance Commissioner and Patricia Sturdevant, Deputy Commissioner & Health Enforcement Advisor as Amicus Curiae upon the request of the Court of Appeal.

Applied Behavioral Analysis (ABA) is an intensive form of therapy which has indisputably been documented to be successful in treating the symptoms of autism in young children. While ABA can be performed by a licensed physician or psychologist, it is often performed, or supervised, by an individual certified by the private Behavior Analyst Certification Board (BACB). The issue raised by this case is whether the Department of Managed Health Care (DMHC), which has jurisdiction over health plans commonly known as health maintenance organizations,[1] is required, by law, to direct health plans within its jurisdiction to provide coverage for ABA when provided, or supervised, by BACB-certified therapists who are not otherwise licensed to practice medicine or psychology. DMHC contends that it may require plans to cover ABA therapy *only* when it was provided by someone licensed to practice medicine or psychology. Plaintiff, Consumer Watchdog,[2] argues that non-licensed, but BACB-certified, ABA therapists[3] are, in fact, recognized by the medical community as proper providers and supervisors of ABA therapy. Thus, their services should be

---

[1] In contrast, the Department of Insurance has jurisdiction over health plans commonly known as preferred provider organizations (also known as "PPOs"). Unless otherwise indicated by context, references to "plans" refer only to health plans within the jurisdiction of DMHC.

[2] There is an individual plaintiff in this case as well, Anshu Batra, M.D. As Dr. Batra's arguments are not distinct from those made by Consumer Watchdog, references to Consumer Watchdog include Dr. Batra.

[3] Some BACB-certified providers are also licensed to practice medicine or psychology; there is no dispute that DMHC requires plans to cover therapy provided by such otherwise-licensed BACB-certified providers. Therefore, for the remainder of this opinion, when we refer to BACB-certified providers, we are referring to those BACB-certified providers who are not otherwise licensed to practice medicine or psychology.

covered by the plans. Consumer Watchdog sought a writ of mandate directing DMHC to respond to any plan member's grievance challenging a denial of coverage for ABA therapy to be provided or supervised by a BACB-certified therapist by ordering the plan to cover such therapy.

We conclude that, under a statute recently enacted by the Legislature, BACB-certification has implicitly been recognized as an exception to the licensing laws and, therefore, DMHC can no longer uphold a plan's denial of coverage for ABA on the basis that a BACB-certified provider is not licensed. However, to the limited extent the issue of DMHC decisions *prior* to the effective date of the new statute are before us, we hold that DMHC had, prior to July 1, 2012, no clear, ministerial duty to order plans to provide coverage for therapy provided or supervised by BACB-certified providers. Thus, the trial court had no authority to issue the requested writ of mandate with respect to such claims. Additionally, we hold that the trial court correctly resolved Consumer Watchdog's challenge to a DMHC policy as violative of the Administrative Procedures Act. We therefore affirm in part and reverse in part the trial court's judgment denying Consumer Watchdog's petition for writ.

## *FACTUAL AND PROCEDURAL BACKGROUND*

In addition to discussing the factual and procedural background of the instant litigation, we also consider the relevant legislative framework. Additionally, we discuss statutory developments which occurred after the trial court issued its judgment.

4

1. *Autism and ABA*

"According to a 2007 report of the California Legislative Blue Ribbon Commission on Autism, '[a]utism spectrum disorders are complex neurological disorders of development that onset in early childhood.' [Citation.] These disorders, which include full spectrum autism, 'affect the functioning of the brain to cause mild to severe difficulties, including language delays, communication problems, limited social skills, and repetitive and other unusual behaviors.' [Citation.] Nationally, autism spectrum disorders affect an estimated one in every 150 children across all racial, ethnic, and socioeconomic backgrounds. [Citation.]" (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 478, fn. omitted.) Amici Curiae Autism Speaks and Autism Deserves Equal Coverage represent that, under more current data, the prevalence rate for autism is approximately 1 in every 88 children.

ABA is a form of behavioral health treatment which develops or restores, to the maximum extent practicable, the functioning of an individual with autism. (Health & Saf. Code, § 1374.73, subd. (c)(1).) Numerous studies indicate that ABA is the most effective treatment known for autistic children. Studies also demonstrate that ABA has lasting results. Autism is understood to be a brain-based neurological disorder. ABA therapy can create new brain connections in a child with autism; these new connections are to be contrasted with the abnormal connections caused by autism. This is not to say that ABA is always successful. Some children show dramatic improvements with ABA, while others make modest or few gains. Studies show that some 10% of children make few or no improvements despite intensive ABA. Evidence indicates that ABA is most

5

effective when begun when the child is very young. There is a "relatively narrow 'window of opportunity' for young autistic children during which [ABA] can mean the difference for many between lifelong severe disability and some approximation to normal functioning." There is no real dispute in this case that ABA is an effective medical treatment for many young autistic children.[4]

ABA is a time-intensive treatment. It is often prescribed for 26 to 40 hours per week. While there can be no doubt that the treatment plan for providing ABA to any autistic child must be established, modified, and supervised by a qualified expert in ABA, the evidence in this case indicates that the actual delivery of services to the child may be performed by a non-expert. A publication by the BACB suggests that a front-line behavioral technician need only be a high school graduate, who has subsequently received training in basic ABA procedures and demonstrated competency. (BACB, Guidelines: Health Plan coverage of Applied Behavior Analysis Treatment for Autism Spectrum Disorder (ver. 1.1, 2012) p. 27.) It appears that ABA, and similar behavior therapies, are somewhat unique among medical treatments in this respect. While the treatment plan must be created, modified, and supervised by a professional, the actual delivery of services may be done by a paraprofessional.

The field of ABA is relatively new. The study often cited as the landmark study which first established the effectiveness of ABA in autistic children was published in 1987. (O. Ivar Lovaas, *Behavioral Treatment and Normal Educational and Intellectual*

---

[4] Indeed, if DMHC questioned the effectiveness of ABA, it would not require it to be covered when provided by *any* therapist, even one licensed to practice medicine or psychology.

*Functioning in Young Autistic Children*, 55 J. Consult. Clin. Psychol. 3 (1987).) The

BACB, a private organization established to grant national credentials to ABA

professionals (not front-line providers), was established in 1998.

(<http://www.bacb.com/index.php?page=1> [as of Sept. 6, 2013].) When health plan

members first sought coverage for ABA, plan denials were upheld on the basis that

ABA was experimental. Independent medical review[5] panels did not uniformly

recognize ABA as a medically necessary treatment until 2007.

The BACB has three levels of certification: (1) Board Certified Behavior

Analyst (requires a Master's degree in a related field, 225 hours of graduate coursework

in behavior analysis, substantial supervised experience, and passing an examination);

(2) Board Certified Behavior Assistant Analyst (requires a Bachelor's degree, 135 hours

undergraduate or graduate coursework in behavior analysis, a lesser amount of

supervised experience, and passing an examination); and (3) Board Certified Behavior

Analyst-Doctoral (requires a Board Certified Behavior Analyst certification and

a doctorate degree in a related field).

2.	*The Knox-Keene Act and Mental Health Parity Act*

In 1975, the Legislature enacted the Knox-Keene Health Care Service Plan Act

of 1975. (Health & Saf. Code, § 1340.) The Act is informally known as the

Knox-Keene Act (Knox-Keene). That Act provides that DMHC "has charge of the

execution of the laws of this state relating to health care service plans and the health

care service plan business including, but not limited to, those laws directing the

---

[5]	We discuss the independent medical review process later in this opinion.

7

department to ensure that health care service plans provide enrollees with access to quality health care services and protect and promote the interests of enrollees." (Health & Saf. Code, § 1341, subd. (a).)

Under Knox-Keene, plans shall provide to their subscribers and enrollees all "basic health care services." (Health & Saf. Code, § 1367, subd. (i).) Basic health care services are defined to include: physician services; hospital inpatient services; diagnostic laboratory services; home health services; and preventive health services. (Health & Saf. Code, § 1345, subd. (b).) DMHC's director is authorized to define the scope of required basic health care services. (Health & Saf. Code, § 1367, subd. (i).) By regulation, home health services (as part of basic health care services) are defined to include "where medically appropriate, health services provided at the home of an enrollee as prescribed or directed by a physician . . . . " (Cal. Code Regs., tit. 28, § 1300.67, subd. (e).) The parties agree that ABA can constitute a home health service; the dispute in this case revolves around the identity of the proper providers of ABA.

Knox-Keene speaks to the issue of licensing. Health and Safety Code section 1367, subdivision (d) provides that a plan shall provide ready referral of patients "to other providers" as appropriate. Knox-Keene defines a "provider" as "any professional person, organization, health facility, or other person or institution licensed by the state to deliver or furnish health care services." (Health & Saf. Code, § 1345, subd. (i).) Health and Safety Code section 1367, subdivision (b) provides that "[p]ersonnel employed by or under contract to the plan shall be licensed or certified by their respective board or agency, where licensure or certification is required by law."

8

Subdivision (f) of that same section provides that the plan "shall employ and utilize allied health manpower for the furnishing of services to the extent permitted by law and consistent with good medical practice."[6] Each section confirms that Knox-Keene requires the use of licensed individuals when the law otherwise requires it. (Cf. *People v. Cole* (2006) 38 Cal.4th 964, 969 [Knox-Keene cannot override restrictions of the Business and Professions Code].)

Subsequently, the Legislature enacted the Mental Health Parity Act (MHPA). (Health & Saf. Code, § 1374.72.) That statute provides that, beginning in July 2000, every health plan providing hospital, medical or surgical coverage must also "provide coverage for the diagnosis and *medically necessary treatment* of severe mental illnesses of a person of any age, and of serious emotional disturbances of a child" as specified in the statute. (Health and Safety Code section 1374.72, subd. (a); italics added.) The

---

[6] With no citation to California authority, Consumer Watchdog assumes that a BACB-certified ABA practitioner is "allied health manpower." We are not so certain. "Allied health manpower" is not defined in Knox-Keene, nor in the Business and Professions Code. At one time, the California Medical Board specifically had a "Division of Allied Health Professions." (See, e.g., Stats. 1993, ch. 1267, § 12.) Although that division no longer exists, the Medical Board of California governs five specific "Allied Health Care Professions." (<http://www.mbc.ca.gov/allied/Index.html> [as of Sept. 6, 2013].) The term "allied health manpower" could refer only to such professionals. However, a Health & Safety Code statute uses the term somewhat more broadly. Health and Safety Code section 127900, describes "allied health professionals" as "including, but not limited to" seven different types of professionals, including some, such as "physician assistants," who are licensed (Bus. & Prof. Code, § 3501), and others, such as "health educators," who are not. In short, it is very difficult to determine, from the California statutes, what is meant by "allied health manpower," as used in Knox-Keene. It is clear, however, that Knox-Keene directs the use of allied health manpower "to the extent permitted by law." If any particular allied health manpower individual was engaging in the unlicensed practice of medicine or psychology, that individual could not be utilized.

9

statute specifically itemizes the "severe mental illnesses" which must be covered, including "[p]ervasive developmental disorder or autism." (Health & Saf. Code, § 1374.72, subd. (d)(7).) Thus, the MHPA provides that all plans providing coverage under Knox-Keene must provide coverage for the "medically necessary treatment" of autism.[7] The MHPA does not specifically define the term "medically necessary treatment," although it does state that certain benefits – outpatient services, inpatient hospital services, partial hospital services, and prescription drugs (if the plan otherwise covers prescription drugs) – must be provided.[8] (Health & Saf. Code, § 1374.72, subd. (b).)

---

[7] The MHPA provides that the medically necessary treatments must be provided "under the same terms and conditions applied to other medical conditions as specified in subdivision (c)." (Health & Saf. Code, § 1374.72, subd. (a).) Those conditions are financial in nature – the maximum lifetime benefit, copayments, and deductibles. (Health & Saf. Code, § 1374.72, subd. (c).)

[8] The question has therefore arisen as to whether a type of treatment, which is excluded from coverage under Knox-Keene as not being a "basic health care service," must nevertheless be provided if "medically necessary" to treat an enumerated mental illness under the MHPA. (*Harlick v. Blue Shield of California* (9th Cir. 2012) 686 F.3d 699 [considering the issue in the context of residential treatment for anorexia, when the policy otherwise excluded residential care].) Even if only "basic health care services" under Knox-Keene are mandated for mental illnesses under the MHPA, the question arises as to whether certain treatment which could be excluded under Knox-Keene as not constituting a basic health care service for *physical* illnesses and disabilities may constitute a basic health care service for an enumerated mental illness. To some extent, this question must be answered in the affirmative. Indeed, the DMHC's regulation effectuating the MHPA requires plans to cover basic health care services under Knox-Keene and "at a minimum . . . services from licensed mental health providers including, but not limited to, psychiatrists and psychologists." (Cal. Code Regs., tit. 28, § 1300.74.72.) In any event, the precise scope of the coverage required under the MHPA is not before us. The dispute in this case is whether licensing is required for ABA to be covered by the plans, not whether ABA is a treatment required to be covered by the plans.

### 3. *Resolution of Grievances*

"As part of its legislative mandate to 'ensure' access to quality care, the Department is required to establish a bifurcated grievance system and to 'expeditiously' and 'thoroughly' review patient grievances." (*California Consumer Health Care Council, Inc. v. Department of Managed Health Care* (2008) 161 Cal.App.4th 684, 687.) One grievance system resolves "disputed health care services." This is the independent medical review (IMR) system. (Health & Saf. Code, § 1374.30.) The second system, which resolves all other grievances, including coverage disputes, will be referred to as the "standard grievance" system.

To be resolved under IMR, a grievance must raise an issue regarding a "disputed health care service," which is defined as any service "eligible for coverage and payment under a health care service plan contract that has been denied, modified, or delayed by a decision of the plan . . . in whole or in part due to a finding that the service is not medically necessary. A decision regarding a disputed health care service relates to the practice of medicine and is not a coverage decision." (Health & Saf. Code, § 1374.30, subd. (b).)

When a grievance is resolved pursuant to IMR, an independent medical reviewer (or reviewers) determines whether the disputed health care service is medically necessary based on the specific needs of the patient, and such information as peer-reviewed scientific evidence, nationally recognized professional standards, and generally accepted standards of medical practice. (Health & Saf. Code, § 1374.22, subd. (b).) A plan must promptly implement the decision of an IMR. (Health & Saf.

11

Code, § 1374.34, subd. (a).) If the IMR decision is in favor of the patient, the plan shall either promptly authorize the services, or reimburse the provider or the enrollee for services already rendered. (*Ibid.*)

In contrast, the standard grievance process is an administrative review conducted by DMHC. When a plan denies or delays services on the basis that the services are not covered under the plan, the plan is required to clearly specify the contract provisions that purportedly exclude coverage. (Health & Saf. Code, § 1368, subd. (a)(5).) If the patient disagrees, the patient may seek review by the DMHC, by means of a standard grievance. (Health & Saf. Code, § 1368, subd. (b)(1)(A).) The DMHC reviews the record and determines whether the challenged service is, in fact, covered. (Health & Saf. Code, § 1368, subd. (b)(5).)

This case concerns, among other things, the decision as to whether particular grievances (regarding ABA) should be resolved by IMR or through the standard grievance process. "All enrollee grievances involving a disputed health care service are *eligible* for review under the [IMR] [s]ystem . . . . " (Health & Saf. Code, § 1374.30, subd. (d)(1), emphasis added.) "If there appears to be any medical necessity issue, the grievance shall be resolved pursuant to [IMR] *or* pursuant to [the standard grievance procedure]." (Health & Saf. Code, § 1374.30, subd. (d)(3), emphasis added.) "In any case in which an enrollee or provider asserts that a decision to deny, modify, or delay health care services was based, *in whole or in part*, on consideration of medical necessity, the department shall have the final authority to determine whether the grievance is more properly resolved pursuant to an [IMR] *or* [as a standard grievance]."

12

(Health & Saf. Code, § 1374.30, subd. (d)(2), emphasis added.)  DMHC "shall be the final arbiter when there is a question as to whether an enrollee grievance is a disputed health care service or a coverage decision."  (Health & Saf. Code, § 1374.30, subd. (d)(3).)

4.  *DMHC's Practice Regarding ABA Grievances*

Plan denials of ABA could involve both issues (i.e., whether ABA is medically necessary and whether ABA is covered by the plan).  Initially, when the denials appeared to raise both questions, DMHC chose to send ABA grievances to IMR.  As noted above, some of the early IMR decisions on ABA upheld the plans' denials, on the basis that ABA was experimental and did not yet constitute the standard of care.  By late 2007, however, IMR decisions regarding ABA were consistently resolved in favor of its medical necessity.

As ABA became more medically accepted, plans focused their denials of ABA on coverage grounds.  For example, some plans denied coverage for ABA by BACB-certified therapists because the plans did not provide coverage for mental health services provided by an *unlicensed* individual.  Other plans denied coverage for ABA based on an exclusion for *any* treatment which *could* safely and effectively be provided by an *unlicensed* individual.

On March 9, 2009, DMHC issued a memorandum to health plans regarding "Improving Plan Performance to Address Autism Spectrum Disorders" (March 2009 memo).  The memorandum was, concededly, not adopted pursuant to the Administrative Procedures Act.  Among other things, the March 2009 memo reconfirmed that plans

must "[c]over all basic health care services required under [Knox-Keene], including speech, physical, and occupational therapies for persons with [autism], when those health care services are medically necessary." The memo goes on to state that plans must "[p]rovide mental health services only through providers who are licensed or certified in accordance with applicable California law." Thus, the March 2009 memo specifically required providers to be licensed if their services were to be covered by the plans.

As to the resolution of grievances, the March 2009 memo states that, "[t]he DMHC will initially make a determination whether the service being sought is a covered health care service. If that determination is made in the affirmative, then any claim that a service is either: (1) experimental or investigational; or, (2) is not medically necessary to treat the patient's condition, will be referred for IMR as required under California law." In other words, Health and Safety Code section 1374.30, subdivision (d)(3) granted the DMHC the authority to determine whether any grievance raising both medical necessity and coverage issues should be resolved through IMR or the standard grievance procedure. By the March 2009 memo, DMHC stated that *all* grievances regarding services for autism raising both types of issues would *first* be resolved through the standard grievance procedure, and would only be sent to IMR if the coverage dispute was resolved in favor of the patient.

5. *The Instant Action*

On June 30, 2009, Consumer Watchdog brought a petition for writ of mandate and complaint against DMHC and its director, Lucinda Ehnes, in her official capacity[9] (collectively DMHC). The operative pleading is the first amended petition and complaint. According to the allegations of the petition, it is violative of the MHPA "for a health plan to refuse to cover any treatment for autism that is deemed medically necessary." (Emphasis omitted.) Consumer Watchdog alleged that the licensing requirement imposed by the March 2009 memo is unsupported by the law, as the law requires coverage for any medically necessary treatment for autism "when it is provided by a licensed provider, a provider that is certified by a professional organization, or individuals who are supervised by a licensed or certified provider." (Emphasis omitted.)

The relevant portion of the petition and complaint alleged six causes of action.[10] The first cause of action sought a writ of mandate directing DMHC, in response to a grievance, "to 'order' any plan that has denied coverage for ABA to an autistic enrollee – where ABA was both medically necessary and was to have been provided or supervised by a licensed or certified professional – to either 'promptly offer and provide' ABA to the enrollee, or to 'promptly reimburse' the enrollee for 'any

---

[9]     The director is now Brent A. Barnhart.

[10]     A seventh cause of action, relating to the Public Records Act, is not at issue in this appeal.

15

reasonable costs' associated with obtaining ABA." The second and third causes of action sought the same relief, by injunction or declaratory relief, respectively.

The fourth cause of action sought writ relief directing DMHC not to enforce the March 2009 memo, as it was adopted in violation of the Administrative Procedures Act. The fifth and sixth causes of action sought the same relief, by injunction or declaratory relief, respectively. These causes of action specifically related to the grievance procedure set forth in the March 2009 memo.

It is important to note the limitations of Consumer Watchdog's petition and complaint. The pleading sought only prospective relief, by means of writ of mandate, injunction and declaratory relief. It sought an order directing DMHC to respond in a certain way to grievances, and to cease implementing the March 2009 memo. It sought no relief with respect to grievances already resolved. Moreover, the petition and complaint named only DMHC as a defendant, not any insurance plan. This case is not a class action seeking compensation from plans for ABA services wrongfully denied.[11]

We also note, at this point, that the relief sought by Consumer Watchdog was necessarily overbroad. Consumer Watchdog sought a writ or injunction directing DMHC to respond to a grievance by ordering the provision of ABA where the ABA

---

[11]    At least one such case had already been filed. *Arce v. Kaiser Foundation Health Plan, Inc., supra,* 181 Cal.App.4th 471 was a class action filed against Kaiser, challenging Kaiser's denial of coverage for behavioral therapy (and speech therapy) to members with autism spectrum disorders, on the grounds that such therapies were non-health care, educational, or custodial care. (*Id*. at p. 480.) The merits were not reached; the appellate opinion in that case related to class certification issues only, and it appears that the case has since been settled. (<www.bizjournals.com/sacramento/news/2013/08/08/Kaiser-to-pay-9m-to-settle-autism-suit.html> [as of Sept. 6, 2013].)

16

was medically necessary and was to have been provided or supervised by a licensed or certified professional. Such a request is overbroad because it fails to take into account the statutorily-mandated limitations on coverage identified in the MHPA: maximum lifetime benefits, copayments, and deductibles. If, for example, a patient grieved a denial of medically necessary ABA, but the ABA was denied on the basis that the patient's maximum lifetime benefit had been exceeded, the denial would have been proper and DMHC would have had no duty to order that the ABA be provided.

Moreover, the instant litigation, in which the only defendant is DMHC, could not possibly consider every possible coverage exclusion in every possible plan. We cannot issue a blanket decision mandating that ABA be provided in every case in which it is medically necessary, without first allowing the health plans an opportunity to be heard on whether their coverage exclusions may apply. To take but one example, DMHC's regulation defining basic health care under Knox-Keene states that "[p]hysician services" constitute basic health care services which *must* be covered, but referral to other professionals, including, among others, occupational therapists and physical therapists, *may* be covered under the plan. (Cal. Code Regs., tit. 28, § 1300.67, subd. (a)(1).) DMHC has provided, by the regulation implementing the MHPA, that "services from licensed mental health providers including, but not limited to, psychiatrists and psychologists" *must* be provided in addition to basic health care services. (Cal. Code Regs., tit. 28, § 1300.74.72, subd. (a).) Setting to one side the licensing issue, if a health plan has chosen, as it is permitted to do so, to exclude coverage for occupational and physical therapists under Knox-Keene, can this exclusion

17

legally be applied to medically necessary treatment for autism under the MHPA? The issue is not before us, and cannot properly be considered without the presence of the health plan which seeks to enforce such an exclusion.

No health plan is a defendant in this action; no policy exclusion is at issue in this case. Instead, Consumer Watchdog raises a challenge solely to the DMHC policy that no coverage will be required for mental health services provided by a provider not licensed or certified under California law. We therefore construe Consumer Watchdog's petition and complaint as seeking an order directing DMHC *not to uphold* a denial of coverage for medically necessary ABA services *on the ground that coverage need not be provided when the provider is not licensed or certified under California law*.

6. *Briefing, Argument, and the Trial Court's Ruling*

In support of its petition and complaint, Consumer Watchdog argued that ABA must be provided in all cases where it is medically necessary. In opposition, DMHC argued that the Legislature "set forth state licensure as the bright-line consumer protection regarding practitioners of health services." DMHC argued that if BACB-certified therapists were treating autism, they were engaging in the unlicensed practice of medicine or psychology under the Business and Professions Code. DMHC took the position that since BACB-certified therapists must not be doing the illegal act of practicing medicine or psychology without a license, their ABA must therefore constitute something other than *treatment*. DMHC concluded that the ABA performed by BACB-certified therapists was *educational* and need not be covered, while only the

18

ABA performed by individuals licensed under California law was medical treatment and therefore required to be provided under the MHPA.

The trial court rejected DMHC's argument that non-licensed ABA providers were engaging in the unlicensed practice of medicine. The court reasoned that the Business and Professions Code concerns itself only with individuals who perform acts for which licenses can be issued. As there are no California licenses for ABA, there is no unlicensed practice of medicine by those who perform ABA. However, the court concluded that DMHC could, itself, impose a licensing obligation as part of its general duties to ensure that health care plans provide quality health care services and to protect the interests of enrollees. As providers of ABA work intensively with fragile autistic children, it was reasonable for DMHC to require that providers of such therapy be subject to the quality controls of state licensure. The court concluded that there was therefore no clear, ministerial duty for DMHC to order ABA when provided by BACB-certified therapists.[12] It therefore denied the writ petition. The court observed that Consumer Watchdog's remedy was "with the Legislature," not the courts.

As to Consumer Watchdog's causes of action with respect to the DMHC's grievance resolution procedures, the trial court concluded that the March 2009 memo constituted a regulation which had not been adopted pursuant to the Administrative

---

[12]     While DMHC argues that the trial court's result was correct, it does not adopt the trial court's argument. DMHC does not suggest that it could, itself, impose a duty of licensure which was not present in Knox-Keene or the MHPA. If an obligation is not imposed on plans by Knox-Keene (or the MHPA), and the statutes do not delegate to DMHC the power to impose such an obligation, it has no authority to do so. (*Kaiser Foundation Health Plan, Inc. v. Zingale* (2002) 99 Cal.App.4th 1018, 1024, 1027.)

Procedures Act. Therefore, the March 2009 memo was invalid. However, the court noted that DMHC could continue to exercise its discretion to resolve coverage disputes before sending an ABA grievance to IMR.

7. *Judgment, Appeal, and Cross-Appeal*

The court entered judgment directing DMHC to discontinue implementing, utilizing or enforcing the March 2009 memo. All other relief was denied. Notice of Entry of Judgment was served on February 1, 2011. Consumer Watchdog filed a motion for new trial, which was denied on April 1, 2011. Consumer Watchdog filed a timely notice of appeal on April 14, 2011.

DMHC filed a notice of cross-appeal from the trial court's ruling with respect to the viability of DMHC's March 2009 memo. The notice of cross-appeal was dated and served on April 29, 2011. However, it was not filed, nor stamped as received by the "Civil Appeals Room," until May 11, 2011. After this court sought additional briefing on the timeliness of the cross-appeal,[13] counsel for DMHC submitted a declaration indicating that the notice of cross-appeal was sent to the court via "Federal Express overnight delivery" on Friday April 29, 2011, with an expected date of delivery to the court of May 2, 2011. Counsel supported this declaration with a copy of the Federal

---

[13] The notice of cross-appeal was not filed within 60 days of service of notice of entry of judgment. (Cal. Rules of Court, rule 8.104(a)(1)(A).) The motion for new trial extended the time to appeal until 30 days after the clerk mailed notice of entry of denial. (Cal. Rules of Court, rule 8.108(b)(1)(A).) Such notice was mailed on April 1, 2011; the notice of cross-appeal was therefore not timely under that extension. Finally, a notice of appeal extends the time for filing a notice of cross-appeal until 20 days after the clerk serves notification of the first appeal. (Cal. Rules of Court, rule 8.108(g)(1).) In this case, the notification was served on April 15, 2011. The notice of cross-appeal was therefore untimely under this extension provision as well.

20

Express airbill dated April 29, 2011, but had no evidence indicating whether the document had been timely delivered to the Los Angeles Superior Court. Indeed, counsel's declaration stated that he attempted to obtain package tracking information from Federal Express after this court had raised the timeliness issue, but Federal Express tracking information was no longer available for this delivery. It is therefore unclear if: (1) Federal Express failed to timely deliver the notice of cross-appeal to Los Angeles Superior Court; or (2) the notice of cross-appeal was timely delivered, and some court error resulted in it not being timely stamped "received" and filed.

8.      *Settlement Agreements*

While the appeal was pending, DMHC reached a settlement agreement with California Physicians' Service dba Blue Shield of California. The agreement noted that, although Blue Shield had previously agreed to provide ABA to its members when rendered by licensed health care providers, it now contended that it was unable to locate sufficient licensed health care providers willing to directly provide ABA to its enrollees. It therefore came to the conclusion that BACB certification constituted a sufficient credential to provide ABA services, and agreed to provide coverage for such services. A similar agreement was reached on July 15, 2011 with Anthem Blue Cross.

9.      *The New Statute*

The trial court had spoken presciently when it stated that Consumer Watchdog's remedy was with the Legislature. On October 9, 2011, Health and Safety Code section 1374.73 was enacted, specifically governing the provision of ABA. We will therefore refer to the statute as the ABA statute.

21

The ABA statute applies, with certain exceptions we discuss below, to every health plan providing hospital, medical or surgical coverage, which is the same language used in the MHPA. As of July 1, 2012, the effective date of the ABA statute, those plans are required to "provide coverage for *behavioral health treatment* for pervasive developmental disorder or autism." (Health & Saf. Code, § 1374.73, subd. (a)(1).) "Behavioral health treatment" is defined to include various treatment programs, and *explicitly includes ABA*. (Health & Saf. Code, § 1374.73, subd. (c)(1).) To constitute behavioral health treatment which must be covered, the following criteria must be met: (1) the treatment must be prescribed by a licensed physician or psychologist; (2) the treatment must be provided under a treatment plan prescribed by a "qualified autism service provider," and be administered by either a qualified autism service provider, or a "qualified autism service professional" or "qualified autism service paraprofessional" supervised by the qualified autism service provider; (3) the treatment plan has measurable goals and is reviewed at least every six months by the qualified autism service provider; and (4) the treatment plan is not used for day care or educational services. (Health & Saf. Code, § 1374.73, subds. (c)(1)(A)-(c)(1)(D).)

A qualified autism service provider, who must prescribe the plan and supervise the delivery of services, is defined as either someone licensed under California law (as a physician, psychologist, occupational therapist, or one of several other enumerated professionals) who designs, supervises or provides treatment for pervasive developmental disorder or autism (Health & Saf. Code, § 1374.73, subd. (c)(3)(B)) *or* a person "certified by a national entity, such as the [BACB] and who designs,

22

supervises, or provides treatment for pervasive developmental disorder or autism."
(Health & Saf. Code, § 1374.73, subd. (c)(3)(A).)

A qualified autism service professional, who may provide services under the supervision of a qualified autism service provider, is defined by reference to approved vendor lists for regional centers.[14]  Anyone approved as a vendor as an Associate Behavior Analyst, Behavior Analyst, Behavior Management Assistant, Behavior Management Consultant, or Behavior Management Program for a regional center is a qualified autism service professional.  (Health & Saf. Code, § 1374.73. subd. (4)(D).)  These categories include, by regulation, individuals certified by the BACB as Board Certified Behavior Analysts and Board Certified Associate Behavior Analysts.[15] (Cal. Code Regs., tit. 17, § 54342, subds. (a)(8) & (a)(11).)

A qualified autism service paraprofessional, who may provide services under the supervision of a qualified autism service provider, is defined as "an unlicensed and uncertified individual" who has adequate education, training, and experience, as

---

[14]     "[T]he State Department of Developmental Services contracts with private nonprofit corporations to establish and operate regional centers. [Citation.]  These regional centers are 'responsible for determining eligibility, assessing needs and coordinating and delivering direct services to individuals with developmental disabilities and their families within a defined geographical area. [Citation.]' [Citation.]"  (*Arce v. Kaiser Foundation Health Plan, Inc., supra*, 181 Cal.App.4th at p. 479, fn. 3.)

[15]     Indeed, the categories also include individuals with a bachelor's degree and certain experience in ABA even without BACB certification.  (Cal. Code Regs., tit. 17, § 54342, subd. (a)(12).)

23

certified by a qualified autism service provider.[16]  (Health & Saf. Code, § 1374.73,

subd. (c)(5).)

In short, with respect to all health plans subject to the ABA statute, they are

required to provide ABA treatment for autistic children when provided, or supervised,

by a BACB-certified therapist.  The ABA statute provided precisely the relief sought by

Consumer Watchdog in the instant action, and Consumer Watchdog does not argue to

the contrary.

The ABA statute, however, becomes inoperative by its own terms on July 1,

2014, and, if not extended, is repealed on January 1, 2015.  (Health & Saf. Code,

§ 1374.73, subd. (g).)  Moreover, three types of health plans are specifically exempted

from the obligations of the ABA statute:  (1) health plans in the Medi-Cal program;

(2) health plans in the Healthy Families Program; and (3) health plans entered into with

the Public Employees' Retirement System (PERS).  (Health & Saf. Code, § 1374.73,

subd. (d).)  As health plans in the Medi-Cal program are also exempt from the MHPA,[17]

---

[16]      Such an individual must also meet criteria set forth in regulations adopted
pursuant to Welfare and Institutions Code section 4686.3.  (Health & Saf. Code,
§ 1374.73. subd. (c)(5)(C).)  That section directs the adoption of emergency regulations
"to address the use of paraprofessionals in group practice provider behavioral
intervention services and establish a rate.  The regulations shall also establish a rate and
the educational or experiential qualifications and professional supervision requirements
necessary for the paraprofessional to provide behavioral intervention services."
(Welf. & Inst. Code, § 4686.3.)  Regulations do not yet appear to have been adopted.

[17]      Both parties assume that Medi-Cal plans not subject to the ABA statute are
nonetheless subject to the requirements of the MHPA.  With respect to Medi-Cal plans,
the ABA statute exempts "A health care service plan contract in the Medi-Cal program
(Chapter 7 (commencing with Section 14000) of Part 3 of Division 9 of the Welfare and
Institutions Code)."  (Health & Saf. Code, § 1374.73, subd. (f).)  The MHPA likewise

24

there are, in effect, two types of health plans (Healthy Families and PERS), which are subject to the requirements of the MHPA, but not the requirements of the ABA statute.

        10.    *The Task Force*

The ABA statute also created an Autism Advisory Task Force, to be convened by DMHC, in consultation with the Department of Insurance, and in collaboration "with other agencies, departments, advocates, autism experts, health plan and health insurer representatives, and other entities and stakeholders that it deems appropriate." (Health & Saf. Code, § 1374.74.) Among other things, the task force was directed to "develop recommendations regarding the education, training, and experience requirements that unlicensed individuals providing autism services shall meet in order to secure a license from the state." (Health & Saf. Code, § 1374.74, subd. (b).)

The task force issued its report on February 21, 2013. (DMHC Autism Advisory Task Force, Report to the Governor of California and the California State Legislature, Feb. 21, 2013.) Among other things, the Task Force unanimously recommended that California create a new license titled Licensed Behavioral Health Practitioner, for the "top level clinicians" of autism services. (*Id*. at p. 19.) The Task Force unanimously recommended that BACB-certified practitioners would qualify for the license (*id*. at pp. 19-20) and that, until such time as the license is established, BACB-certification would be sufficient for top level clinicians (*id*. at pp. 15, 20). As for the front-line

---

provides that it "shall not apply to contracts entered into pursuant to Chapter 7 (commencing with Section 14000) . . . of Division 9 of Part 3 of the Welfare and Institutions Code, between the State Department of Health Services and a health care service plan for enrolled Medi-Cal beneficiaries." (Health & Saf. Code, § 1374.72, subd. (f).)

25

providers of treatment, they need only have high school diplomas, sufficient training, and be adequately supervised. (*Id*. at pp. 17-18.) The Task Force also unanimously recommended that, in order to ensure consumer safety, all providers of autism services be registered with the state's Trust Line Registry. (*Id*. at p. 21.)

In short, the Task Force unanimously recommended that ABA be provided or supervised by BACB-certified individuals, and that a license be created for BACB-certified individuals. However, the Task Force also recommended registration with Trust Line of all providers of autism services.

11.   *Current Legislative Activity*

On February 19, 2013, Senate Bill 322 was introduced. The bill was apparently intended as a placeholder, as it read, in its entirety: "It is the intent of the Legislature to enact legislation to provide for the certification of [ABA] therapists." (Sen. Bill No. 322 (2013-2014 Reg. Sess.) as introduced Feb. 19, 2013.) However, the Senate subsequently amended the bill to pertain to a different topic entirely (water recycling). (Sen. Bill No. 322 (2013-2014 Reg. Sess.) as amended Apr. 9, 2013.) As a result, there does not appear to be any legislation pending regarding licensure of ABA therapists, as recommended by the Task Force.

However, a bill is currently pending to extend the operation of the ABA statute, currently set to expire on July 1, 2014, to Jan. 1, 2017. (Sen. Bill No. 126 (2013-2014 Reg. Sess.) as amended Aug. 8, 2013.)

## ISSUES ON APPEAL

While the applicable legislative frameworks and procedural history of this case are, as set forth above, somewhat complex, the issues presented by this appeal are relatively straightforward:  (1) Under law existing prior to the ABA statute, did BACB-certified therapists engage in the unlicensed practice of medicine or psychology? (2) Is the bulk of Consumer Watchdog's appeal moot in light of the ABA statute? (3) What are the DMHC's duties with respect to grievances regarding ABA provided by BACB-certified therapists to enrollees in plans *exempted* from the ABA statute? and (4) With respect to the grievances filed between the date of Consumer Watchdog's petition and complaint and the effective date of the ABA statute, should the trial court have required DMHC to direct the plans to provide ABA from BACB-certified providers?

The following additional issues are also raised with respect to the March 2009 memo:  (5) Is DMHC's cross-appeal untimely?  and (6) Did the trial court err in refusing to direct that DMHC return to its pre-March 2009 memo procedures?

## DISCUSSION

1.      *The Practice of ABA Therapy Constitutes the Practice of Psychology*

In order to properly analyze the issues before us, we first consider whether the practice of ABA therapy constitutes the practice of medicine (or any subset thereof). Business and Professions Code section 2052, part of the Medical Practice Act (Bus. & Prof. Code, § 2000 et seq.), provides that "any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or

27

mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a [crime]."

This language is very broad, encompassing any person who "treats . . . any . . . physical or mental condition of a person." The Legislature has enacted several exemptions from the statute; the language of the exemptions serves to underline the breadth of the statute. These exemptions include "the domestic administration of family remedies"[18] (Bus. & Prof. Code, § 2058, subd. (a); the giving of nutritional advice (Bus. & Prof. Code, § 2068); "[t]esting and guidance programs in schools" (Bus. & Prof. Code, § 2062); medical students performing medical acts as part of their course of study (Bus. & Prof. Code, § 2064); and the limited practice of alternative and complementary healing arts services, if certain disclosures are made.

---

[18]   In *Bowland v. Municipal Court* (1976) 18 Cal.3d 479, a defendant charged with the unlicensed practice of medicine argued that the statute was unconstitutionally vague, as it is unclear whether the statute forbids such conduct as "the statement by an unlicensed person to a friend that the friend sounds like he has a cold; the suggestion that a grief be assuaged by a long trip; or advice by an unlicensed person that one suffering from a cold administer to himself aspirin and orange juice." (*Id*. at p. 491.) Our Supreme Court did *not* hold that these hypotheticals do not constitute the practice of medicine. Instead, it suggested that "[i]nformal recommendation among friends as to the efficacy of nonprescription vitamin compounds or ocean cruises seems akin to sharing a 'family remedy,' " under the precursor statute to Business and Professions Code section 2058, subdivision (a). (*Bowland v. Municipal Court, supra,* 18 Cal.3d at p. 492.)

(Bus. & Prof. Code, §§ 2053.5, 2053.6). Indeed, in enacting the latter statutes, governing the practice of alternative and complementary medicine, the Legislature made express findings and declarations stating, "Notwithstanding the widespread utilization of complementary and alternative medical services by Californians, the provision of many of these services may be in technical violation of the Medical Practice Act [citation]. Complementary and alternative health care practitioners could therefore be subject to fines, penalties, and the restriction of their practice under the Medical Practice Act even though there is no demonstration that their practices are harmful to the public. [¶] The Legislature intends, by enactment of this act, to allow access by California residents to complementary and alternative health care practitioners who are not providing services that require medical training and credentials. The Legislature further finds that these nonmedical complementary and alternative services do not pose a known risk to the health and safety of California residents, and that restricting access to those services due to technical violations of the Medical Practice Act is not warranted." (Stats. 2002, ch. 820, § 1, subds. (b) & (c).)

Case law also confirms the necessity of a broad interpretation of the practice of medicine. Business and Professions Code section 2052 "represents a reasonable exercise of the state police power, as the statute was designed to prevent the provision of medical treatment to residents of the state by persons who are inadequately trained or otherwise incompetent to provide such treatment, and who have not subjected themselves to the regulatory regime established by the Medical Practice Act [citation]. Causing or intending an injury is not an element of the offense . . . . " (*Hageseth v.*

*Superior Court* (2007) 150 Cal.App.4th 1399, 1416-1417.) "The state . . . clearly has a strong and demonstrable interest in protecting its citizens from persons who claim some expertise in the healing arts, but whose qualifications have not been established by the receipt of an appropriate certificate." (*Bowland v. Municipal Court, supra,* 18 Cal.3d at p. 494.) That the unlicensed practitioner may be competent is no defense. Our system, "in order to assure the protection of the public, requires that a person's competency be determined by the state and evidenced by a license." (*Magit v. Board of Medical Examiners* (1961) 57 Cal.2d 74, 85.)

It is apparent, then, that the practice of medicine is very broad. However, although licensed physicians may practice medicine (Bus. & Prof. Code, § 2051), they are not the only individuals permitted to perform acts which constitute the practice of medicine. As noted in Business and Professions Code section 2052, if the individual is "authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law," the act does not constitute the unlicensed practice of medicine. This is confirmed by Business and Professions Code section 2061, which provides, "Nothing in this chapter shall be construed as limiting the practice of other persons licensed, certified, or registered under any other provision of law relating to the healing arts when such person is engaged in his or her authorized and licensed practice."

Numerous such authorizations exist. For example, licensed dentists may practice dentistry (Bus. & Prof. Code, § 1600); licensed (registered) nurses may practice nursing (Bus. & Prof. Code, § 2732); licensed psychologists may practice psychology (Bus. & Prof. Code, § 2903); licensed chiropractors may practice chiropractic (Bus. & Prof.

30

Code, § 1000-4); licensed occupational therapists may practice occupational therapy (Bus. & Prof. Code, § 2570.3); licensed physical therapists may practice physical therapy (Bus. & Prof. Code, § 2630); licensed respiratory care practitioners may practice respiratory care (Bus. & Prof. Code, § 3730); licensed speech-language pathologists and audiologists may practice speech-language pathology and audiology (Bus. & Prof. Code, § 2532); licensed acupuncturists may practice acupuncture (Bus. & Prof. Code, § 4937); licensed midwives may practice midwifery (Bus. & Prof. Code, § 2507); and certificated dispensing opticians may fit and adjust spectacles and contact lenses (Bus. & Prof. Code, § 2553). Each of these practitioners is authorized to perform acts which constitute the practice of medicine, as limited by the scope of their own licenses.[19] In short, physicians have broad authority to practice medicine, while every other licensed health professional has a limited license to perform tasks which are within the scope of that license, which were previously within the exclusive province of physicians. (58 Ops. Cal. Atty. Gen. 186, 187 (1975).)

We are concerned, in this case, with the provision of ABA therapy, and DMHC's argument that it cannot direct plans to provide ABA therapy performed by unlicensed individuals, as to do so would be directing plans to pay for the unlicensed practice of medicine. The parties focus their arguments on the general statute prohibiting the unlicensed practice of medicine (Bus. & Prof. Code, § 2052), while we believe the more

---

[19] Indeed, in some cases, the statutory scheme providing for the licensure of such professionals expressly states that they are not licensed to practice medicine beyond the practice of their specific healing art. (See, e.g, Bus. & Prof. Code, §§ 2530.4 [speech-language pathologists and audiologists]; 2621 [physical therapists]; 3705 [respiratory care practitioners].)

31

appropriate statute is the specific statute prohibiting the unlicensed practice of psychology (Bus. & Prof. Code, § 2903). While the unlicensed practice of psychology could constitute the unlicensed practice of medicine, it is more appropriate to focus on the narrower statute. (See *People v. McCall* (2013) 214 Cal.App.4th 1006, 1010-1012.)[20]

Business and Professions Code section 2903 prohibits the practice of psychology without a license. "The practice of psychology is defined as rendering or offering to render for a fee to individuals, groups, organizations or the public *any psychological service* including *the application of psychological* principles, *methods*, and procedures *of* understanding, predicting, and *influencing behavior, such as the principles pertaining to learning*, perception, motivation, emotions, and interpersonal relationships; *and the methods and procedures of* interviewing, counseling, psychotherapy, *behavior modification*, and hypnosis . . . . [¶] *The application of these principles and methods includes*, but is not restricted to: diagnosis, prevention, *treatment*, and amelioration *of*

---

[20]     *People v. McCall* involved the prosecution of a midwifery *student* who, while unsupervised, provided prenatal care for a patient, and attended and assisted at a birth, manually guiding the baby out, cutting the umbilical cord, removing the placenta, giving the mother an injection to stop hemorrhaging, and suturing a tear. The defendant argued that she should have been prosecuted for the misdemeanor of the unlicensed practice of midwifery, rather than felony unlicensed practice of medicine. While the Court of Appeal acknowledged the general principle that a specific statute is considered an exception to the general one, it rejected the defendant's argument, stating that she "may have committed a misdemeanor violation of the Midwifery Act by performing midwife services without the required supervision of a licensed midwife or a physician and surgeon. But she did a great deal more than that. Her conduct above and beyond the failure to secure supervision constituted, as the jury found, practicing medicine without certification, a felony violation of the general statute." (*Id*. at p. 1016.)

32

psychological problems and emotional and *mental disorders* of individuals and groups."[21] (Emphasis added.)

ABA involves the application of psychological methods to influence behavior, and can be considered a form of behavior modification. When used as a treatment for autism, it therefore falls within the definition of psychology.[22] As ABA falls solidly within the definition of psychology, its practice by an individual who is not licensed to practice psychology, or permitted to do so by another license, constitutes the unlicensed practice of psychology.

Perhaps in an attempt to avoid the unintended consequence of arguing that BACB-certified practitioners are committing the unlicensed practice of psychology,[23]

---

[21]    An exception to the statute shall not prevent "qualified members of other recognized professional groups licensed to practice in the State of California, such as, but not limited to, physicians, clinical social workers, educational psychologists, marriage and family therapists, optometrists, psychiatric technicians, or registered nurses, or attorneys admitted to the California State Bar, . . . or duly ordained members of the recognized clergy, or duly ordained religious practitioners from doing work of a psychological nature consistent with the laws governing their respective professions." (Bus. & Prof. Code, § 2908.)

[22]    DMHC requires plans to cover ABA therapy when the child's physician indicates that the child's condition requires the services of a licensed health care provider, such as a psychologist, marriage and family therapist, or clinical social worker. Each of these individuals may "do[] work of a psychological nature consistent with the laws governing their respective professions." (Bus. & Prof. Code, § 2908.)

[23]    DMHC *expressly* does not want to make this argument. In its final brief in this appeal, DMHC stated, "The DMHC has never argued that [BACB-certified therapists'] services are illegal – an argument raised repeatedly by amici to sensationalize the issue without any basis. Rather, the DMHC's position has consistently been that persons that provide ABA to treat autism (as opposed to providing ABA in an educational or other non-healthcare setting) must meet the State's licensing requirements." This is a very fine distinction, and, as we shall discuss, one which cannot be sustained. In any event,

DMHC makes the novel argument that ABA performed by BACB-certified practitioners is *educational*, while ABA performed by otherwise licensed individuals is *medical treatment*. In other words, DMHC argues that whether a practice constitutes a medical treatment depends on the identity of the individual performing the practice. The conclusion finds no support in law or logic.

There are some acts which may be medical or non-medical depending on the circumstances in which they are performed. Hypnosis, for example, may be used for the purposes of entertainment or self-improvement; it only becomes the practice of psychology when it is used as a method of diagnosis or treatment. (Bus. & Prof. Code, § 2908 [exempting from the prohibition on the unlicensed practice of psychology "persons utilizing hypnotic techniques which offer avocational or vocational self-improvement and do not offer therapy for emotional or mental disorders"][24]; see also 54 Ops. Cal. Atty. Gen. 62 (1971).) Massage for the purposes of relaxation does not constitute the practice of medicine (*In re Maki* (1943) 56 Cal.App.2d 635, 644); massage when used to "cure or relieve a certain . . . ailment" is the practice of medicine. (*People v. Cantor* (1961) 198 Cal.App.2d Supp. 843, 848.) In each instance, the focus

despite DMHC's express intent to avoid arguing that BACB-certified therapists' services are illegal, they have, in fact, repeatedly made the argument. Before the trial court, DMHC argued that it should not "compel plans to commit an illegal act by providing ABA through unlicensed providers." In its respondent's brief before this court, DMHC stated, "[A]bsent a Legislative exemption, unlicensed ABA therapists are precluded from providing ABA health care treatment to children with autism."

[24] The statute also permits hypnosis for medical purposes by a non-psychologist, if the hypnotist does so by referral from a licensed doctor, dentist, or psychologist. (Bus. & Prof. Code, § 2908.)

is on the goal of the act – whether it is performed for a medical purpose – not on the identity of the individual performing it. The conclusion makes logical sense. An appendectomy is a medical practice whether performed by a doctor or a short order cook. Similarly, frying an egg would not be transformed into a medical practice if performed by a licensed physician. It is the act itself which is the focus of the inquiry, not the actor. (Cf. *Board of Medical Quality Assurance v. Andrews* (1989) 211 Cal.App.3d 1346, 1348, 1358 [acts performed by the "Religious School of Natural Hygiene" and its "first minister" indisputably constituted the practice of medicine].)

We therefore necessarily reach the conclusion that no party or amicus wishes us to reach: the practice of ABA constitutes the practice of psychology. It follows that, prior to the enactment of the ABA statute, BACB-certified therapists were engaging in the unlicensed practice of psychology. We stress the reluctance with which we reach this legally-mandated conclusion.[25] BACB-certified therapists are indisputably

---

[25] We note that, as a historical matter, it appears that California has not chosen to license practitioners of a particular health care specialty until such time as those practitioners had already been practicing their professions in California. For example, the Legislature initially passed a bill to license occupational therapists in 1976. That bill was vetoed by the governor as unnecessary regulation (see Cal. Dept. of Health, Enrolled Bill Rep. on Assem. Bill No. 1100 (1977-1978 Reg. Sess.) September 15, 1997, p. 1), and in 1977, the Legislature enacted a statute providing that anyone holding himself or herself out as an occupational therapist was required to meet certain qualifications. (Bus. & Prof. Code, fmr. § 2570.) By the time this so-called "title protection" statute was enacted in 1977, occupational therapy "ha[d] for many years been an accepted part of the health care team." (See Cal. Dept. of Health, Enrolled Bill Rep. on Assem. Bill No. 1100 (1977-1978 Reg. Sess.) September 15, 1997, p. 1.) In other words, California tends to wait until perhaps thousands of individuals are routinely engaging in the unlicensed practice of medicine before creating the legal framework within which those individuals can *legally* practice their specialty. This case

recognized as proper practitioners of ABA. Before this litigation arose, BACB-certified

practitioners were providing services in regional centers. The Department of Insurance

was requiring plans within its jurisdiction to provide coverage for BACB-certified

providers. After the trial court issued its ruling, at least two plans reached private

agreements with DMHC to provide coverage for ABA provided by BACB-certified

therapists. The Task Force *unanimously* agreed that BACB-certified therapists should

provide, or supervise, the delivery of ABA, and recommended they be licensed. While

otherwise licensed individuals could also provide ABA services, using such individuals

to provide the time-intensive therapy is substantially more costly than using

BACB-certified providers (and BACB-certified *supervision* of unlicensed providers),

with no documented evidence that the ABA which otherwise-licensed providers

perform is, in any way, superior.[26] Moreover, there is some evidence that there are not

enough licensed individuals willing and able to provide ABA to all autistic children in

need of ABA in California. In short, the law previously characterized as illegal

a practice which everyone agrees should be authorized and encouraged. Ultimately,

with the enactment of the ABA statute, the Legislature provisionally resolved the

simply presents another such example. As we shall next discuss, the Legislature has
recently acted in the case of BACB-certified practitioners of ABA therapy.

[26]     DMHC required ABA to be provided when a prescribing physician would
indicate that the child's needs required that ABA be provided by a licensed practitioner.
The record does not indicate that a plan ever disputed such a prescription; that is to say,
there are no records of IMR's in which a medical review panel determined whether any
particular child's needs for ABA were so serious that a *licensed* ABA provider was
required over a BACB-certified provider.

then-existing disconnect between the law and reality. We now turn to the effect of the enactment of this statute on the instant appeal.

2. *The Bulk of the Appeal is Moot*

"[I]t is clear under a long and uniform line of California precedents that the validity of the judgment must be determined on the basis of the current statutory provisions, rather than on the basis of the statutory provisions that were in effect at the time the injunctive order was entered. As observed by Witkin: 'Because relief by injunction operates in the future, appeals of injunctions are governed by the law in effect at the time the appellate court gives its decision.' [Citations.]" (*Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 23.) "The reason a reviewing court applies current rather than former law when reviewing an injunctive decree is because injunctive relief operates in the future. [Citations.] It would be an idle gesture to affirm an injunctive decree because it was correct when rendered, 'with full knowledge that it is incorrect under existing law, and with full knowledge that, under existing law, the decree as rendered settles nothing so far as the future rights of these parties are concerned.' [Citation.] It does not matter whether the Legislature intended the new law to be retroactive. The reviewing court is interested in the law's prospective effect since that is when the decree under review will operate." (*City of Watsonville v. State Dept. of Health Services* (2005) 133 Cal.App.4th 875, 884.)

As we have construed the petition and complaint in this matter, Consumer Watchdog sought prospective relief (in the form of a writ of mandate, injunction, and declaratory relief) providing that, in response to future grievances, DMHC can no

longer uphold a denial of ABA coverage on the basis that ABA to be provided or supervised by a BACB-certified therapist constitutes the unlicensed practice of medicine or psychology.  This question, in large part, has been resolved by the recent enactment of the ABA statute. With respect to all plans which were not expressly excluded from the ABA statute, the statute *requires* those plans to provide coverage for ABA to be provided or supervised by a BACB-certified therapist.  DMHC concedes this, and has implemented the statute.  Writ relief is therefore unnecessary; Consumer Watchdog's appeal is largely, but not entirely, moot.

3.    *DMHC May Not Uphold a Denial of Coverage for ABA Performed or Supervised by a BACB-Certified Therapist, on the Basis that the Provider Is Engaging in the Unlicensed Practice of Medicine or Psychology, Even When the Plan is Exempted from the ABA Statute*

We next consider plans expressly exempted from the ABA statute; these are plans in the Healthy Families Program and plans entered into with PERS.  Such plans are not required, under the ABA statute, to provide coverage for ABA provided or supervised by BACB-certified providers.

This does not mean, however, that we ignore the existence of the ABA statute when considering these plans.  As noted above, we apply the law as it currently exists on appeal in resolving a claim for injunctive relief.  Under current law, the argument can no longer be made that BACB-certified providers are engaging in the unlicensed practice of medicine or psychology.  The ABA statute constitutes legislative approval of the practice of ABA by BACB-certified providers and individuals under their supervision.  While the ABA statute only *requires* certain plans to provide coverage for

ABA by BACB-certified providers and individuals under their supervision, the ABA statute also has the effect of *implicitly* authorizing BACB-certified providers and those under their supervision to practice ABA, regardless of Business and Professions Code sections 2052 and 2903.[27] This authorization is not limited to the BACB-certified therapists providing services under plans covered by the ABA statute. Such a conclusion would mean that a BACB-certified therapist providing ABA for an autistic child under one health plan is acting legally, but the very same BACB-certified therapist providing the very same ABA for the very same autistic child is committing the unlicensed practice of psychology if the child's parent changes employers and obtains health coverage through a Healthy Families plan or one which has contracted with PERS. Such a result would be nonsensical. The legality of an act which constitutes the

_____

[27]    We have focused our argument on the unlicensed practice of medicine and psychology under the Business and Professions Code. It could be argued that even if BACB-certified therapists are *exempted* by the ABA statute from the licensure requirements, Knox-Keene *requires licensure*, and is not satisfied by a mere exemption from licensure. The argument is unpersuasive for three reasons. First, Knox-Keene indicates that personnel employed by plans "shall be licensed . . . where licensure . . . is required by law." (Health & Saf. Code, § 1367, subd. (b).) Second, and similarly, Knox-Keene requires plans to utilize allied health manpower "to the extent permitted by law." (Health & Saf. Code, § 1367, subd. (f).) Thus, to the extent Knox-Keene requires licensure, it requires licensure only as required by law; the ABA statute's exemption from licensure is sufficient. Third, the Business and Professions Code itself defines "license" to mean "license, certificate, registration, or other means to engage in a business or profession . . . . " (Bus. & Prof. Code, § 23.7.) The ABA statute, which impliedly permits BACB-certified individuals to practice or supervise ABA, constitutes "other means" sufficient to satisfy the licensure statute. Indeed, DMHC concedes this point, stating that the ABA statute provides the necessary *authorization* "for the provision of ABA by an individual who is unlicensed, but certified by a private organization, or supervised by a licensed or certified individual."

39

practice of medicine or psychology cannot be determined by the identity of the health plan covering the patient for whom the act is performed.

Thus, DMHC cannot uphold a denial of coverage for ABA provided or supervised by a BACB-certified therapist, on the basis that the therapist is unlicensed, even when the plan is exempted from the requirements of the ABA statute.[28] To that extent, Consumer Watchdog is entitled to relief.

4.      *Consumer Watchdog is Not Entitled to Relief With Respect to Grievances Which Predate the Effective Date of the ABA Statute*

Although our review of the issues is mainly forward-looking, there is one group of already-resolved grievances which we must address. Consumer Watchdog filed its petition and complaint on June 30, 2009. When a party seeks mandate, it argues that it is entitled to relief at the institution of proceedings. (*Morris v. Noguchi* (1983) 141 Cal.App.3d 520, 523.) If, under the law as it existed on June 30, 2009, Consumer Watchdog was entitled to relief, the trial court erred in denying Consumer Watchdog's writ petition, and we must order retroactive relief for all grievances improperly resolved by DMHC from the date of the complaint going forward.

Consumer Watchdog, however, is not entitled to such relief. As discussed above, the practice of ABA constitutes the practice of psychology. Prior to the effective date of

---

**28**      We again stress that we are not concluding that the health plans exempted from the ABA statute are, in fact, subject to its terms. The ABA statute does not require these plans to provide ABA; we do not require them to do so, either. We simply hold that DMHC's practice of *upholding denials* of coverage *on the basis* that BACB-certified therapists are unlicensed is no longer legally justified. The ABA statute has concluded that these individuals possess sufficient qualifications such that further licensure is unnecessary.

the ABA statute, BACB-certified therapists practicing ABA were engaging in the unlicensed practice of psychology. Thus, DMHC had no clear duty to order plans within its jurisdiction to provide coverage for the unlicensed practice of psychology. Indeed, Knox-Keene requires the use of licensed personnel where licensure is required (Health & Saf. Code, § 1367, subd. (b) & (i)), and, clearly, a license is required for the practice of psychology (Bus. & Prof. Code, § 2903). Thus, DMHC did not act improperly by denying coverage for ABA provided by unlicensed practitioners prior to the effective date of the ABA statute.

5. *DMHC's Cross-Appeal is Untimely*

We next turn to issues surrounding the March 2009 memo and the trial court's conclusions that: (1) the memo violated the Administrative Procedures Act; but (2) DMHC would not be required to return to its pre-March 2009 method of resolving grievances, and order all grievances regarding ABA which raised both coverage and medical necessity issues to IMR.

DMHC purported to appeal from the court's order declaring the March 2009 memo violative of the Administrative Procedures Act. We cannot reach this issue, as DMHC's notice of cross-appeal is untimely. As discussed above (see fn. 13, *ante*), DMHC's notice of cross-appeal was not timely under any applicable Rule of Court. DMHC states that it timely transmitted the notice of cross-appeal through Federal Express, and provides evidentiary support for this claim. There is no evidence, however, as to *when* the document was delivered by Federal Express to the court. It is clear that one of two things occurred. Either: (1) Federal Express erred, and did not

41

timely deliver the shipment; or (2) Federal Express timely delivered the shipment, but employees of the Los Angeles Superior Court failed to timely mark the notice of cross-appeal as received.[29] DMHC, however, has no evidence that the error here was the clerk's, rather than Federal Express's. DMHC has no tracking information from Federal Express indicating when the package was delivered, no declaration from its counsel indicating that it confirmed timely receipt of the notice of cross-appeal with the superior court clerks, and certainly no evidence that Federal Express never makes a mistake.[30] Indeed, as between Federal Express and the superior court clerks, the presumption runs in favor of the clerks. "It is presumed that official duty has been regularly performed." (Evid. Code, § 664.) While there is a similar presumption that a letter correctly addressed and properly mailed is presumed to have been received "in the ordinary course of mail" (Evid. Code, § 641), the statute has "no application to the filing of a notice of appeal." (*Thompson, Curtis, Lawson & Parrish v. Thorne* (1971)

---

[29]     Under California Rules of Court, rule 8.25(b)(1), a document is deemed filed on the date the clerk receives it. Thus, if the clerk timely received the notice of cross-appeal, even if it was not marked as filed until later, it would be considered timely filed.

[30]     DMHC's counsel's declaration states only that counsel's "office had a history of filing documents with the Los Angeles County Superior Court using Federal Express overnight service. That service had reliably resulted in proper and on-time filings." That no overnight delivery company is perfect is a fact of such common knowledge that it would be a proper subject of judicial notice under Evidence Code section 452, subdivision (g). While this court has not found a reasonably indisputable source for Federal Express's on-time rate, a frequently cited "infographic" from 2011 indicates a rate of "express packages delivered on time" of 88%. <http://www.infographicsshowcase.com/fedex-verses-ups-infographic/> (as of Sept. 6, 2013).

21 Cal.App.3d 797, 801.) DMHC's cross-appeal must therefore be dismissed as untimely.[31]

6. *The Trial Court Did Not in Err in Rejecting Consumer Watchdog's Request that DMHC Be Directed to Return to Pre-March 2009 Memo Procedures*

After the trial court invalided the March 2009 memo, Consumer Watchdog sought the additional relief of an order directing DMHC to return to its pre-March 2009 methods of resolving grievances relating to the provision of ABA – specifically, to direct that those grievances be resolved under IMR. The trial court correctly denied this relief.

Health and Safety Code section 1374.30, subdivision (d)(3) grants DMHC discretion to determine whether a grievance raising an issue of medical necessity is to be resolved in IMR or through the standard grievance procedure. Subdivision (d)(2) of that statute expressly states, "[i]n any case in which an enrollee or provider asserts that a decision to deny, modify, or delay health care services was based, in whole or in part, on consideration of medical necessity, the department shall have the final authority to

---

[31] However, based on the record before us, we believe that the trial court's ruling was correct. The March 2009 memo was indisputably adopted without compliance with the Administrative Procedures Act. DMHC argues that compliance with the Act was not required as the March 2009 memo constituted the only legally tenable interpretation of the grievance procedures. The contention is without merit. When considering a grievance raising both issues of coverage and medical necessity, the grievance "shall be resolved pursuant to [IMR] or pursuant to [the standard grievance procedure]." (Health & Saf. Code, § 1374.30, subd. (d)(3).) As the grievance shall be resolved under either procedure, it is clear that the position taken in the March 2009 memo – that such grievances were to be resolved under the standard grievance procedure first – was not the only tenable interpretation of the governing statutes. Indeed, the fact that DMHC had previously resolved such grievances through IMR demonstrates that this was a viable alternative under the statutes.

43

determine whether the grievance is more properly resolved pursuant to an [IMR] or [as a standard grievance]." DMHC cannot be directed to resolve all grievances raising issues of medical necessity and coverage under IMR any more than it can determine, by rule not adopted in accordance with the Administrative Procedures Act, to resolve all such grievances under the standard grievance process. DMHC must exercise its discretion with respect to each grievance. That DMHC may have overreached in the March 2009 memo does not mean that DMHC loses its discretion in future cases. (Cf. *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 576-577 [an interpretation adopted in an invalid regulation is not necessarily wrong].)

## *DISPOSITION*

The judgment is affirmed in part and reversed in part and the matter remanded for further proceedings consistent with the views expressed in this opinion. Specifically, the judgment should be modified to provide that DMHC be enjoined from upholding a plan's denial of ABA services to be provided or supervised by a BACB-certified individual on the basis that the provider is not licensed as required by Knox-Keene. This applies to all plans within DMHC's jurisdiction, including plans exempted from the scope of the ABA statute. Such relief shall apply retroactively from the effective date of the ABA statute, and continue as long as that statute is in effect.[32] The judgment is otherwise affirmed. DMHC's cross-appeal is dismissed as untimely. The parties shall bear their own costs on appeal.

### *CERTIFIED FOR PUBLICATION*

CROSKEY, J.

WE CONCUR:

KLEIN, P. J.                          KITCHING, J

---

[32]     This modification in the judgment will not prevent DMHC from upholding such a denial on any other legal basis; it simply enjoins DMHC from upholding a denial on the basis that a BACB-certified provider, or someone working under the BACB-certified provider's supervision, is unlicensed.